**CLARK COUNTY SOLID WASTE MANAGEMENT DISTRICT, Appellee,**

v.

**DANIS CLARKCO LANDFILL COMPANY et al., Appellant.**

[Cite as *Clark Cty. Solid Waste Mgt. Dist. v. Danis Clarkco Landfill Co.* (1996), 109 Ohio App.3d 19.]

Court of Appeals of Ohio,
Second District, Clark County.

Nos. 95–CA–67, 95–CA–71.

Decided Jan. 31, 1996.

*Thomas E. Trempe*, Clark County Assistant Prosecuting Attorney, for appellee Clark County Solid Waste Management District.

*Eastman & Smith, Barry W. Fissel* and *Dirk P. Plessner*, for appellee.

*Faruki, Gilliam & Ireland, Charles J. Faruki* and *Jeffrey T. Cox*, for appellant.

*Betty D. Montgomery*, Attorney General, *Bryan F. Zima* and *Joan R. Kooistra*, Assistant Attorneys General, for appellant Donald R. Schregardus, Director of Environmental Protection.

---

FREDERICK N. YOUNG, Judge.

Appellants Danis Clarkco Landfill Company ("Danis") and the Ohio Environmental Protection Agency ("OEPA") appeal from the trial court's declaratory judgment in favor of appellee Clark County Solid Waste Management District ("District").

This appeal involves two consolidated cases in which Danis and the OEPA each contest the District's authority to consider certain "siting" criteria when reviewing Danis's plans to construct a landfill in Clark County. Additionally, Danis contends that the trial court erred in not allowing more discovery and asserts that declaratory judgment was improper absent a "definite and concrete" controversy.

The appellants' claims stem from the District's March 31, 1993 adoption of two rules regulating solid waste disposal in Clark County. In relevant part, the rules required general plans and specifications for any proposed solid waste disposal facility to be submitted to and approved by the Clark County Board of Commissioners. The rules also prohibited the construction of any solid waste disposal facility not complying with the Clark County Solid Waste Management Plan.[1]

---

1. District Rule 2–393 provides:

> "No person, municipal corporation, township, or other political subdivision shall construct, enlarge or modify any solid waste transfer, disposal, recycling or resource recovery facility until general plans and specifications for the proposed improvement have been submitted and approved by the Clark County, Ohio Board of County Commissioners as complying with the Solid Waste Management Plan of the Clark County Solid Waste Management District.
> " * * * All general plans and specifications shall be submitted in a format which provides the information described in Part II, Section 8.b and Appendix M of the Clark County Solid Waste Management Plan. All such general plans and specifications shall be clearly marked as complying with the requirements of this Rule No. 2 and Section 343.01(G)(2) of the Revised Code."

Similarly, District Rule 3–393 provides:

Shortly after the District's adoption of these rules, Danis submitted plans to construct· a solid waste landfill in Clark County. However, Danis also disputed the District's authority to apply the county's siting requirements when determining Danis's compliance with the Clark County Solid Waste Management Plan. Specifically, Danis contended that the siting requirements in the county's plan applied only to "identified" facilities, *i.e.*, those designated by the District as necessary to meet the District's solid waste disposal needs. Since it was not proposing an "identified" facility, Danis reasoned that it could not be subjected to the District's siting requirements. Danis also argued that the District's siting criteria, as applied, resulted in the District's establishment of design standards, a function reserved exclusively for the OEPA.

The District subsequently brought a declaratory judgment action against Danis, the OEPA, and two citizen groups. The District sought a declaration that it could require the proposed Danis landfill to comply with the siting criteria provided in the Clark County Solid Waste Management Plan. The District and the OEPA filed cross motions for summary judgment on September 16, 1994. Danis joined in the OEPA's motion on September 20, 1994, and filed its own cross-motion for summary judgment on October 21, 1994.

Thereafter, the trial court issued a two-page decision and judgment entry on June 8, 1995, granting the District's request for declaratory relief. Specifically, the trial court made the following findings:

"1. Clark County Solid Waste Management District is empowered by Ohio Revised Code Section 343.01(G) to adopt, publish and enforce Rule No. 2–393;

"2. Clark County Solid Waste Management District is empowered by Ohio Revised Code Section 343.01(G) to adopt, publish and enforce Rule No. 3–393;

"3. Having adopted and published Rule No. 2–393, Clark County Solid Waste Management District may follow the siting procedure and criteria described in Part II, Section 8.b and Appendix M of the Clark County Solid Waste Management Plan in making its determination whether the general plans and specifications of the proposed Danis Clark Landfill comply with the plan;

"4. Clark County Solid Waste Management District is required by Ohio Revised Code Section 3734.55(C)(4) to follow the siting procedure and criteria described in Part II, Section 8.b and Appendix M of the Clark County Solid Waste Management Plan in making its determination whether the general plans and specifications of the proposed Danis Clark Landfill comply with the plan;

---

"No person, municipal corporation, township, or other political subdivision, shall construct, modify or enlarge any solid waste transfer, disposal, recycling, or resource recovery facility that does not comply with the Clark County, Ohio Solid Waste Management Plan."

"5. Any proposed sanitary landfill that is found unacceptable by 'Siting Procedure C' in Part II, Section 8, is not in compliance with the Clark County Solid Waste Management Plan."

Danis and the OEPA subsequently filed timely appeals, which we have consolidated for our review. In essence, Danis argues that the trial court erred by (1) finding Danis to be subject to the District's site evaluation process; (2) concluding that the District's siting criteria, as applied, did not require the District's impermissible consideration and application of design criteria; (3) ignoring discovery requests by Danis and awarding summary judgment based upon incomplete facts; and (4) awarding declaratory relief in the absence of a controversy. In addition, the OEPA contends that the trial court's declarations, viewed collectively, violate R.C. 343.01(G)(2)'s prohibition against districts adopting design standards. The OEPA also asserts that the trial court's ruling improperly merges the statutorily separate roles of the OEPA director and local solid waste management districts.

█ Rather than considering each of Danis's and the OEPA's assignments of error in turn, we will combine the arguments, when appropriate, to facilitate efficient appellate review. We start our analysis with Danis's first assignment of error, which provides:

"ASSIGNMENT OF ERROR NO. 1: The trial court failed to recognize that the District has no statutory authority to apply the site identification strategy required under Ohio Rev.Code section 3734.53(A)(8) to facilities not 'identified' as needed to serve the District's capacity needs."

In this assignment of error, Danis claims that the trial court erred when it ruled that the District could apply its facility siting requirements to Danis's proposed landfill. We begin our resolution of this issue with a brief review of Ohio's legislative scheme governing solid waste disposal. Pursuant to R.C. 3734.52(A), 3734.52(B), and 343.01(A), each county in the state must maintain a solid waste management district or participate in a joint county solid waste management district. Furthermore, all territory in a county is under the jurisdiction of the county or joint solid waste management district for purposes of (1) preparing, adopting, submitting, and implementing a district solid waste management plan, and (2) providing for, or causing to be provided for, the safe and sanitary management of solid wastes. See R.C. 3734.52(A).

The solid waste management plans mentioned in R.C. 3734.52(A) must demonstrate the availability of sufficient facilities to meet a district's solid waste management needs for ten years. See R.C. 3734.53(A). To assure compliance with this requirement, R.C. 3734.53(A)(6) requires each district plan to project the yearly amount of solid waste to be disposed of in the district. Additionally,

R.C. 3734.53(A)(7) requires each district plan to identify additional solid waste facilities needed to dispose of the waste projected in R.C. 3734.53(A)(6). Finally, R.C. 3734.53(A)(8) requires each district plan to include a strategy for identifying sites to place the additional facilities identified in R.C. 3734.53(A)(7).

In the present case, Danis's proposed landfill is not a facility "identified" by the Clark County Solid Waste Management District pursuant to R.C. 3734.53(A)(7). Since R.C. 3734.53(A)(8) requires a district's solid waste management plan to include a siting strategy only for identified facilities, Danis contends that the siting provision is inapplicable to unidentified facilities such as its proposed landfill. Indeed, Danis asserts that R.C. 3734.53(A)(8)'s site identification strategy relates exclusively to identified facilities. In support of this argument, Danis reasons that "solid waste management districts lack statutory authority to establish siting criteria for non-identified facilities because division (A)(8) is expressly limited to identified needed capacity facilities and no other statutory provision authorizes a district to establish facility siting criteria."

Conversely, the District argues that two legislative provisions authorize the application of its site identification strategy to nonidentified facilities. In particular, the District relies upon R.C. 3734.53(C)(2) and 343.01(G)(2). R.C. 3734.53(C)(2) provides:

"The solid waste management plan of a county or joint district may provide for the adoption of rules under division (G) of section 343.01 of the Revised Code after approval of the plan under section 3734.55 of the Revised Code:

" * * *

"(2) Governing the maintenance, protection, and use of solid waste collection and solid waste disposal, transfer, recycling, and resource recovery facilities within the district *and requiring the submission of general plans and specifications for the construction, enlargement, or modification of any such facility to the board of county commissioners or board of directors of the district for review and approval as complying with the plan or amended plan of the district[.]* " (Emphasis added.)

Additionally, R.C. 343.01(G)(2) states:

"To the extent authorized by the solid waste management plan of the district * * *, the board of county ·commissioners of a county district or board of directors of a joint district may adopt, publish, and enforce rules:

" * * *

"(2) Governing the maintenance, protection, and use of solid waste collection or other solid waste facilities located within its district. The rules adopted under division (G)(2) of this section shall not establish design standards for solid waste

facilities and shall be consistent with the solid waste provisions of Chapter 3734. of the Revised Code and the rules adopted under those provisions. *The rules adopted under division (G)(2) of this section may prohibit any person, municipal corporation, township, or other political subdivision from constructing, enlarging, or modifying any solid waste facility until general plans and specifications for the proposed improvement have been submitted to and approved by the board of county commissioners or board of directors as complying with the solid waste management plan or amended plan of the district."* (Emphasis added.)

An analysis of R.C. 3734.53(C)(2) reveals that it grants county districts the authority to adopt rules requiring the submission of plans for the construction of *any* solid waste disposal facility. Furthermore, the plans submitted must demonstrate compliance with the district's solid waste management plan. Similarly, R.C. 343.01(G)(2) allows a county district to adopt and enforce rules prohibiting *any* person from constructing *any* solid waste disposal facility until general plans have been submitted demonstrating compliance with the district's solid waste management plan. The plain language of these statutes authorizes a county solid waste management district to subject *all* proposed facilities to the county's ten-year plan.[2]

In the present case, the District's solid waste management plan states at Section IV.2 that a District committee will administer and supervise the development of new and expanded facilities. Furthermore, Section IV.2(a) explains that the plan's siting criteria will guide the District in identifying the location of *all* new solid waste management facilities within the District. Additionally, Section IV.2(b) provides for the adoption of rules pursuant to R.C. 343.01 prohibiting any person from constructing any solid waste disposal facility until general plans for the project receive the District's approval.[3] Section IV.2(b) also states that the general plans submitted will be evaluated against relevant criteria specified in the rule and based upon factors set forth in the plan's siting strategy. Thus, through these provisions the District has demonstrated its intent to subject all proposed solid waste facilities to the District's siting strategy, not just those facilities "identified" as necessary to fulfill the District's needs.

---

**2.** The only limitation on this statutory authorization is found in R.C. 3734.53(D). This provision exempts two types of facilities from the requirements of a District's solid waste management plan: (1) facilities that dispose exclusively of waste generated by the facilities' owners, and (2) facilities that dispose exclusively of waste generated from the combustion of coal.

**3.** In accordance with this authorization, the District adopted Rule 2–293 and Rule 3–393, the two provisions at issue in the present appeal.

We find the District's actions permissible. As explained above, the Ohio legislature has allowed county districts to evaluate any proposed facility in light of requirements contained in the county's solid waste plan. In the present case, the District's plan includes a siting strategy for identified facilities as required by R.C. 3734.53(A)(8). However, the plan goes further and also includes language mandating application of the siting criteria to *all* proposed solid waste disposal facilities. In particular, the plan at Part IV.2(a) states that the "[s]iting strategy, described in detail in Part II(8) and in Appendix M, will guide the District in identifying the location of *all* new solid waste management facilities within the district." (Emphasis added.)

Furthermore, Part IV.2(b) of the District's plan provides for the adoption of rules, pursuant to R.C. 343.01, prohibiting the construction of any solid waste facility until the District approves general plans for the project. Part IV.2(b) of the plan also states: "Such general plans will be evaluated against relevant criteria to be specified in the rule, based on factors set out in the siting strategy of the Plan." Consequently, in accordance with R.C. 343.01's grant of authority, the District enacted Rules 2–293 and 3–393, the two rules at issue. As we noted earlier, these provisions require (1) the submission of general plans for the construction of any solid waste disposal facility, including (2) demonstrated compliance with the District's plan. Furthermore, pursuant to Rule 2–393 the general plans submitted specifically must address the District's siting criteria. The District was not required to take these steps, but we find nothing in the Revised Code curtailing its ability to do so.

In opposition to this determination, Danis recites R.C. 3734.53(A), which states that a district's solid waste management plan "shall provide for, demonstrate and certify the availability of and access to sufficient solid waste management facility capacity * * *." Danis contends that this capacity-assurance function is the plan's primary, if not sole, statutory purpose. Consequently, Danis argues that any rulemaking powers conferred upon districts by R.C. Chapters 3734 and 343 must relate exclusively to the securing of access to sufficient long-term solid waste capacity. Therefore, an unidentified facility, such as the proposed Danis landfill, would not be part of the District's long-term strategy and would not be subjected to rules enacted under the foregoing statutes.

We disagree with Danis's statutory interpretation. The primary purpose of R.C. 3734.53(A) *is* assuring the long-term availability of solid waste disposal facilities. Indeed, the provision states that district plans *shall* address such concerns. However, R.C. 3734.53(C) states that district plans *may* address other concerns. Specifically, R.C. 3734.53(C)(2) grants districts rulemaking authority to govern the maintenance, protection, and use of solid waste facilities. The provision also allows districts to oversee the construction, enlargement, or

modification of any facility. This diverse rulemaking authority is consistent with R.C. 3734.52, which places all county territory "under the jurisdiction of the county or joint solid waste management district for the purposes of preparing, adopting, submitting, and implementing the solid waste management plan for the county or joint district *and* for the purposes of providing for, or causing to be provided for, the safe and sanitary management of solid wastes * * *." (Emphasis added.)

Consequently, we agree with the District that R.C. 3734.53(C)(2) and 343.01(G)(2) grant the District discretion to enforce rules subjecting all proposed facilities to its plan, which includes the detailed siting strategy. The language of this legislation is clear, and we find no relevant limitations on the express authority granted to the District. Indeed, through these statutes the Ohio General Assembly has afforded county districts the authority to require any proposed facility to comply with its solid waste plan.

In the present case, the District's plan provides that all proposed facilities must meet the District's siting requirements. We find this provision entirely appropriate. The location of a proposed landfill, identified or not, certainly is a matter of local District concern, and we find nothing in the Revised Code prohibiting the District's action.[4] Accordingly, we overrule Danis's first assignment of error.

█ Having determined that the District may subject Danis's proposed landfill to the siting strategy contained in the District's plan, we next must consider whether the siting strategy, itself, violates any provisions of the Revised Code. Danis and the OEPA raise this issue in their second and first assignments of error, respectively. Based upon their similarity, we will consider these two assignments of error together.

In its second assignment of error, Danis claims:

"ASSIGNMENT OF ERROR NO. 2: The trial court erred by failing to declare the Plan's siting procedures and criteria (at Part II, Section 8.b and Appendix M) invalid as applied because those siting procedures and criteria require consideration and application by the District of design criteria, an area reserved exclusively to the Ohio Environmental Protection Agency ('OEPA'), and

---

4. In its brief to this court, Danis contends that the siting requirements of R.C. 3734.53(A)(8) relate exclusively to identified solid waste facilities. Moreover, Danis stresses that R.C. 3734.53(A)(8) is "expressly limited" to such facilities. While we agree that the statute itself *is* expressly limited to identified facilities, we find nothing to suggest that siting considerations, in general, must be reserved *exclusively* for such facilities. In other words, R.C. 3734.53(A)(8) requires a district to consider the siting of identified facilities, but we do not construe its silence concerning nonidentified facilities as a prohibition against the District applying its siting strategy in all cases.

prohibited from the District's consideration by Ohio Rev.Code section 343.01(G)(2)."

Similarly, the OEPA's first assignment of error states:

"Assignment of Error No. 1. The trial court erred in declaring that the District may and must find that a landfill does not 'comply with the district plan,' and so may not be constructed, if the landfill is unacceptable under the siting criteria contained in Part II, Section 8.b of the District plan, because the District's exercise of such authority will violate the prohibition against establishing landfill design standards set forth in R.C. Section 343.01(G)(2)."

In these two assignments of error, Danis and the OEPA contend that the District's application of its siting strategy to the proposed Danis facility violates R.C. 343.01(G)(2). Specifically, the appellants claim that the District's siting strategy, as applied, allows the District to establish design standards—a function the Ohio legislature has reserved exclusively for the OEPA.

Like the previous assignment of error, this argument requires us to construe the language of R.C. 343.01(G)(2) and applicable portions of the District's plan. As noted above, R.C. 343.01(G)(2) allows county districts to require the submission and approval of plans for any proposed solid waste facility. Pursuant to this provision, county districts also may demand compliance with their solid waste management plans. R.C. 343.01(G)(2) imposes two restrictions upon a district's rulemaking authority, however. First, a district's rules shall not establish design standards for solid waste disposal facilities. Second, a district's rules shall be consistent with several identified portions of the Revised Code.

In the present case, Danis and the OEPA contend that the District plan's siting strategy requires the District's consideration, application, and establishment of design standards in violation of R.C. 343.01(G)(2). The relevant portions of the District's solid waste management plan are Part II, Section 8 and Appendix M.

Part II, Section 8 is entitled "A Strategy for Identification of Sites for the Additional Solid Waste Management Facilities and Capacity Identified under Division (A)(7) of this Section." It provides a comprehensive review of the District's process for siting solid waste management facilities within Clark County. Section 8.b states that the siting process includes three procedures that may be used depending upon a proposed facility's type and complexity. Furthermore, each procedure includes two parts. Part I requires the District to determine whether a proposed facility complies with the goals and objectives of the Clark County Solid Waste Management Plan. Part II requires the District "to determine whether the proposed facility and site are appropriate for the District by evaluating the facilities and sites according to specific requirements and criteria." These "specific requirements and criteria" are found in Appendix

M of the District's plan, and their interpretation underlies our resolution of this assignment of error.

As a sanitary landfill needing an OEPA installation permit, Danis was required to provide the District with preliminary information and to comply with detailed site evaluation criteria. These requirements are contained in Appendix M, List E of the District's plan. Specifically, List E provides horizontal and vertical isolation requirements that mirror current OEPA regulations governing a proposed facility's physical location. More important, List E also establishes a "Landfill Siting Matrix System." List E, Section III.2.c explains the matrix system as follows:

"In addition to the general horizontal and vertical isolation requirements, a siting matrix system shall be used to evaluate less definitive criteria of importance to the District. Areas of concern are listed as criteria with respect to landfill facility siting. Each criterion is ranked according to its relative importance in the matrix by an assigned weighting factor. For each of the criteri[a], the specific site conditions proposed by the developer will be evaluated. This point system can be used to compare facility sites to one another or can be used in comparison to a standard for an acceptable landfill site."

The matrix includes four categories: (1) hydrogeologic conditions, (2) design criteria, (3) facility impacts, and (4) host community concerns. The District evaluates a proposed landfill based upon its score in each of these categories. The maximum number of points a potential developer can achieve under each criterion is ten. A proposed landfill must score at least eighty percent of the possible points in each category to be acceptable under the District plan.

The present assignment of error concerns the District's evaluation of design criteria, the second category in the matrix. List E, Section III.3.b provides that a District advisory committee "will evaluate the design of the landfill to determine whether it compliments hydrogeological conditions." The committee's review includes evaluation of a proposed facility's linear design, final cover, leachate collection, decomposition gas control, and groundwater monitoring system. Section III.3.b presents a five-step process for evaluating and scoring these aspects of a facility's design.

Step one addresses linear design and states:

"The [Ohio Adm. Code] 3745–27 regulations identify minimum specifications for the type of liner that shall be used in the area of solid waste placement. They specify a double liner system; a geomembrane liner placed on a recompacted soil liner. The recompacted soil liner is to be constructed according to specified design parameters.

"The staff or consultant support to the District shall determine the minimum acceptable composite liner based upon local conditions as applied to OAC standards."

Step one then awards no points to a facility failing to meet minimum liner design specifications, eight points to a facility meeting minimum standards, and ten points to a facility exceeding minimum standards.

Similarly, step two addresses a facility's final cover and states:

"The OAC regulation 3745–27–11 identif[ies] minimum specifications in the construction of a cap system over the area of solid waste placement. The [District] staff or consultant support shall determine the minimum acceptable cap based on the local conditions as applied to OAC standards. A proposed facility meeting the minimum standard will receive eight (8) points * * *."

Step three concerns a facility's leachate collection system. It states:

"The OAC regulation 3745–27–08 identifies minimum specifications in the construction of a leachate management system of a sanitary landfill. The [District] staff or consultant support shall determine the minimum acceptable leachate management system based on the local conditions as applied to OAC standards. A proposed facility/site meeting the minimum standard will receive eight (8) points * * *."

Like step one, steps two and three also award zero points for failing to meet minimum standards or ten points for exceeding minimum standards. Step four differs from the previous three, however. It concerns a facility's decomposition gas management system and provides:

"The OAC regulation 3745–27–12 requires that a decomposition gas monitoring system around [the] perimeter of a landfill be installed if a residence is located within 1000 feet of the limits of solid waste placement. A proposed facility/site meeting the minimum standard will receive eight (8) points."

Step four, unlike the previous three steps, does not allow the District to determine minimum acceptable standards "based upon local conditions as applied to the OAC standards."

Step five, the final step, involves calculating the overall design criteria score to be used in category two of the landfill siting matrix. Step five provides:

"To determine the point value for design criteria to be used in the Landfill Siting Matrix, add all point values assigned to Steps 1 through 4 above, [and] multiply by .25. A minimum of 8 (eight) points is required to meet the required siting matrix. All individual scores from steps 1 through 4 must be above the stated minimums."

In their respective assignments of error, Danis and the OEPA contend that the foregoing siting matrix scheme violates R.C. 343.01(G)(2) because it ignores the statute's prohibition against Districts establishing design standards. The OEPA stresses that the plan's siting strategy, by its own terms, purports to "determine whether the proposed facility and site are appropriate for the District by evaluating the facilities and sites according to specific requirements and criteria." These criteria include the design elements outlined above.

We find the appellants' argument on this issue persuasive. As we explained above, steps one through four of the District's evaluation first identify the minimum applicable OEPA standards for various design elements. Steps one, two, and three then provide that the District staff or consultant support shall determine minimum acceptable standards for each element "based on local conditions as applied to OAC standards." Significantly, step four does not allow the District to establish minimum acceptable standards. Instead, it recites the OEPA standard for decomposition gas management systems as found in Ohio Adm.Code 3745–27–12 and awards a passing score to any facility meeting the OEPA standard.

To the extent steps one, two, and three allow the District to determine minimum acceptable design standards, however, we hold that those provisions violate R.C. 343.01(G)(2). Without question, any independent District "evaluation" of a proposed facility's design risks establishing design standards. Such danger is evident in the present case. The District plan recites the OEPA requirements, but it grants the District discretionary power to establish its own minimum design standards. These District standards presumably may conflict with and exceed the OEPA regulations because they are based upon the District's perception of local conditions as applied to the Ohio Administrative Code requirements. However, if the District requires a developer to exceed OEPA regulations, based upon local conditions or otherwise, the District effectively establishes its own design standards in violation of R.C. 343.01(G)(2).

The plain language of steps one, two, and three grants the District discretion to deviate from and exceed OEPA standards. The three provisions do not recite the Ohio Administrative Code design requirements and then mandate mechanical application of those requirements. Indeed, empowering the District staff to review OEPA standards but requiring strict compliance with those standards would prove futile. Instead, steps one, two, and three allow the District staff to consider not just OEPA regulations but local conditions as well. Without question, then, drafters of the District plan contemplated some staff discretion when they devised steps one, two, and three.

Furthermore, as we noted above, step four does not authorize consideration of local conditions. It simply recites the OEPA standard and awards a passing

score to any facility meeting that standard. However, the District elected to deviate from strict compliance with OEPA standards in steps one, two, and three. In so doing, the District created the possibility that a landfill acceptable under OEPA design standards would be unacceptable—based upon a blend of OEPA regulations and local conditions—in the District's eyes. Such a result violates R.C. 343.01(G)(2).

Nevertheless, the District seeks to avoid this conclusion by arguing that its plan *refers* to OEPA design requirements but does not *establish* independent standards. In fact, the District contends that its siting procedure "recognizes and yields to the design standards established by the OEPA in Chapter 3745 of the Ohio Administrative Code by automatically grading out a proposed facility at passing scores within the Matrix System when the facility meets the minimum standards of the OEPA."

For the reasons explained more fully above, however, we find the District's interpretation of its siting strategy at odds with the language of its plan. By its own terms, Appendix M, List E does not "automatically" award a passing score to a proposed facility meeting minimum OEPA standards. Instead, the plan allows the District staff or consultant support to determine minimum acceptable standards based upon OEPA regulations *and* local conditions. As we noted above, however, the District possesses no such authority. Establishing District design standards less stringent than the OEPA's violates the Ohio Administrative Code, and establishing District design standards more stringent than the OEPA's violates R.C. 343.01(G)(2).

Despite this conclusion, the District supports its argument by relying upon another portion of its solid waste management plan. Specifically, the District cites the following introductory language from page one of Appendix M:

"Any facility sited under these criteria must meet the minimum established regulations set forth by the Ohio EPA. As the State regulations change, these criteria shall be updated by reference. All such regulations overrule the criteria specified herein. The siting process will not violate or exceed OEPA regulations as set forth. This plan recognizes the director of the OEPA's right to waive specific requirements relative to this Site Evaluation Process."

This general provision, which precedes the plan's intricate siting strategy, declares that the District's siting process will not exceed OEPA standards. Furthermore, it provides that any conflicting OEPA regulations overrule the plan's siting criteria. Consequently, the District contends that its plan recognizes the superiority of OEPA regulations and, therefore, does not violate R.C. 343.01(G)(2).

However, following this introductory language, which undeniably attests to the superiority of OEPA regulations, the plan grants the District discretion to exceed OEPA design standards. Thus, the District's plan was internally inconsistent from its inception. The introduction asserts compliance with what latter provisions violate. Furthermore, we find applying the plan's introductory language to the District's siting strategy impossible. The plan states that OEPA regulations overrule the criteria specified in the plan. However, this court cannot discern how to strike invalid portions of the District's siting strategy yet salvage the complex siting matrix.

The wholesale extraction of language allowing District review "based upon local conditions as applied to OAC standards" would destroy the operation of the matrix. Absent such language, the District staff would be relegated to rubber-stamping those plans meeting OEPA design standards and rejecting those failing OEPA design standards. This redundant exercise would serve no purpose,[5] and it clearly was not contemplated by the plan's drafters. Consequently, we are not prepared to modify the District's intricate siting matrix on the basis of a conclusory sentence stating that all state regulations overrule the criteria specified in the plan.

Accordingly, we hold that the siting strategy contained in Appendix M, List E enables the District to establish design standards in violation of R.C. 343.01(G)(2), and we sustain Danis's second assignment of error and the OEPA's first assignment of error.

We now turn to the OEPA's second assignment of error, which contends that the District's application of its siting strategy to Danis unlawfully duplicates and intrudes upon the OEPA's permitting authority. More specifically, the OEPA asserts that some elements of the District's siting criteria also are considered by the OEPA when it decides whether to issue an installation permit. However, our resolution of the previous assignment of error renders this assignment of error moot. Having declared the District's siting strategy invalid because it establishes design standards, we need not consider whether the siting strategy improperly

**5.** The only possible benefit of mechanically applying OEPA standards would arise in the context of multiple developers competing to become the District's "identified" facility. In such a case, several proposed facilities could receive a passing score for meeting OEPA standards. However, the District's plan awards "extra credit" for facilities exceeding OEPA standards. Consequently, the District could choose among several OEPA-acceptable facilities and select the one obtaining the highest score in the District's siting matrix. In this context, the District would not be prohibiting the construction of any landfill meeting OEPA standards. Instead, it would be utilizing its independent evaluation to choose the best facility, among several acceptable candidates, for District identification. However, the present appeal does not involve multiple developers vying for District identification. Therefore, we see no value in granting the District authority to "evaluate" design elements of the proposed Danis landfill.

intrudes upon the OEPA's permitting authority. Therefore, pursuant to App.R. 12(A)(1), we exercise our discretion to decline ruling on the issue.

Having addressed both assignments of error advanced by the OEPA, we now will consider Danis's remaining assignments of error. Danis's third assignment of error states:

"ASSIGNMENT OF ERROR NO. 3: The trial court erred by failing to allow Danis to pursue its requested discovery of the facts underlying the District's efforts to apply Rules 2–393 and 3–393 as a pretext to block the Danis landfill when Danis offered documents and affidavits showing that (a) the District officials adopted the Rules to thwart the Danis landfill by erecting additional hurdles for Danis, and (b) the discovery requested by Danis was 'reasonably calculated to lead to the discovery of admissible evidence' within Ohio R.Civ.P. 26(B)(1)."

In this assignment of error, Danis argues that the trial court granted the District's motion for summary declaratory judgment without first allowing Danis to pursue discovery calculated to reveal the District's reasons for adopting, applying, and selectively enforcing its rules and siting strategy. Danis cites the following four discovery requests as "exemplary of the balance of the discovery requests":

"REQUEST NO. 3: All writings identifying which solid waste facilities have been designated by the District.

"REQUEST NO. 4: All writings relating to the District's consideration, development, submission or approval of the Siting Process/Ranking Scheme set forth in the Plan for designated facilities.

"REQUEST NO. 5: All writings relating to the District's application of the Siting Process/Ranking Scheme set forth in the Plan to undesignated facilities.

"REQUEST NO. 6: All writings relating to the District's consideration, development, submission or approval of other siting procedures and criteria for facilities not designated in the Plan."

Danis contends that these requests were relevant to issues before the trial court because each "addresses the issue of whether the Plan's [siting process and ranking scheme] can be imposed on Danis' new sanitary landfill."

In response, the District first alleges that Danis failed to preserve this issue for our review. Specifically, the District claims that Danis did not file a motion to compel discovery with the trial court or file a Civ.R. 56(F) motion to continue the trial court's consideration of the pending summary judgment motion. Consequently, the District asserts that Danis did not preserve its right to contest the issue on appeal.

As the District properly notes, Danis never filed a motion to compel discovery or a motion for a continuance before the trial court's ruling. Nevertheless, we cannot accept the District's conclusion that Danis failed to preserve the discovery issue for appeal. As this court stated in *Lillback v. Metro. Life Ins. Co.* (1994), 94 Ohio App.3d 100, 640 N.E.2d 250, "[p]arties who find themselves in the position of having to respond to a motion for summary judgment before adequate discovery has been completed must seek their remedy through Civ.R. 56(F)." *Id.* at 103, 640 N.E.2d at 252. A party who fails to seek such relief does not preserve his right to challenge the adequacy of discovery upon appeal. *R & R Plastics, Inc. v. F.E. Myers Co.* (1993), 92 Ohio App.3d 789, 798, 637 N.E.2d 332, 338–339; *Stegawski v. Cleveland Anesthesia Group, Inc.* (1987), 37 Ohio App.3d 78, 87, 523 N.E.2d 902, 911.

Civ.R. 56(F) states:

"Should it appear from the affidavits of a party opposing the motion for summary judgment that he cannot for sufficient reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just."

Although Danis did not file a motion to compel discovery or file a motion requesting a continuance, it did include a "Rule 56(F) affidavit" with its supplemental memorandum of April 20, 1995. The affidavit, sworn to by Steven Stanley, vice-president of Danis Environmental Management Company, states at paragraph nine:

"9. Pursuant to Ohio Rule of Civil Procedure 56(F), Danis cannot present by affidavit all of the facts demonstrating the District's selective enforcement of its Plan and Rules, and the bias and prejudicial acts and statements by District officials to thwart the Danis landfill. Danis has sought to discover those facts; however, they are within the exclusive knowledge of District officials; the District's refusal to consent to discovery has blocked Danis' efforts."

The District contends that this affidavit does not meet the requirements of Civ.R. 56(F) in part because Danis used the affidavit to support its discovery arguments then pending before the trial court rather than to support a motion to continue the trial court's consideration of the District's summary judgment motion. At footnote one of its supplemental memorandum, however, Danis asserted three purposes for the supplemental memorandum: (1) to oppose the District's motion, (2) to support its own motion, and (3) to endorse the OEPA's motion.

Thus, we disagree that Danis supplied the affidavit solely to advance its motion. By its own terms, Danis's summary judgment motion directly opposed the

District's motion. Indeed, most of the declarations sought by Danis were legal conclusions contradicting the declarations sought by the District. For example, Danis's final request sought a ruling that "the five declarations requested by the District * * * are denied." Consequently, we believe that the affidavit constituted a sufficient attempt by Danis, a party opposing summary judgment, to explain that it "cannot for sufficient reasons stated present by affidavit facts essential to justify [its] opposition * * *." See Civ.R. 56(F).

We believe that this attempt preserved the discovery issue for appeal. Although the affidavit did not accompany a motion to compel discovery or a motion for a continuance, Danis's affidavit did accompany its supplemental memorandum, which in part opposed the District's summary judgment motion. In *Tucker v. Webb Corp.* (1983), 4 Ohio St.3d 121, 4 OBR 367, 447 N.E.2d 100, the Ohio Supreme Court considered a similar issue involving an appellant who failed even to cite Civ.R. 56(F). The *Tucker* court noted that "[a]lthough the appellant did not cite Civ.R. 56(F) specifically, he did in effect ask the trial court for more discovery in attempting to justify his opposition to [the appellee's] motion for summary judgment." *Id.* at 122, 4 OBR at 368–369, 447 N.E.2d at 102. In *Tucker*, the appellant's memorandum in opposition to summary judgment alleged his inability to conduct "substantial discovery," but the appellant did not include a Civ.R. 56(F) affidavit or file a motion for a continuance.

The Ohio Supreme Court in *Tucker* reasoned that the appellant had chosen not to rest his opposition to the appellee's summary judgment motion on the inadequacy of discovery alone. *Id.* at 123, 4 OBR at 369, 447 N.E.2d at 102. Instead, "[f]aced with the task of opposing appellee's motion, appellant attempted to include all possible theories contra to appellee's motion, as well as proposing his own motion for summary judgment." The court found the appellant's actions appropriate. *Id.;* see, also, *Dixon v. Kroger Co.* (June 12, 1995), Athens App. No. 94CA1649, unreported, 1995 WL 356497 (noting that "the Ohio Supreme Court has held where a party was allotted insufficient time to discover the essential facts, that it is error for a trial court to enter summary judgment against a party who has asked for more discovery in a memorandum in opposition, even though the party has not specifically moved for a continuance pursuant to Civ.R. 56[F]").

In the present case, as in *Tucker,* Danis challenged the sufficiency of discovery in a summary judgment memorandum. Unlike the appellant in *Tucker,* however, Danis went further and did include a Civ.R. 56(F) affidavit alleging inadequate discovery. Given these circumstances, we cannot say that Danis's failure specifically to request a continuance terminated its ability to raise the issue on appeal. In fact, Civ.R. 56(F) does not specifically require a party to request a continuance. The rule provides only that a party must show by affidavit an inability to

state facts justifying his opposition to summary judgment. We hold that Danis's affidavit fulfilled this requirement and preserved the issue for our review.

██ Consequently, we now must consider whether the trial court erred when it granted the District summary declaratory judgment without providing additional discovery. At the outset, we note that "[t]he provisions of Civ.R. 56(F) are all discretionary. They are not mandatory." *Carlton v. Davisson* (1995), 104 Ohio App.3d 636, 648, 662 N.E.2d 1112, 1119, citing *Ramsey v. Edgepark, Inc.* (1990), 66 Ohio App.3d 99, 106, 583 N.E.2d 443, 448. Thus, trial courts possess broad discretion when regulating the discovery process, and a trial court's decision will not be reversed absent an abuse of discretion. *State ex rel. Daggett v. Gessaman* (1973), 34 Ohio St.2d 55, 57, 63 O.O.2d 88, 89–90, 295 N.E.2d 659, 660; *Stegawski v. Cleveland Anesthesia Group, Inc.* (1987), 37 Ohio App.3d 78, 86–87, 523 N.E.2d 902, 910–911. Furthermore, a judgment preventing the requesting party from pursuing discovery will not be reversed unless the ruling causes substantial prejudice. *Shaver v. Std. Oil Co.* (1990), 68 Ohio App.3d 783, 800, 589 N.E.2d 1348, 1359.

██ In the present case, we cannot say that the trial court's failure to allow additional discovery constituted an abuse of discretion and substantially prejudiced Danis's position. The only issues properly before the trial court were (1) the District's statutory authority to adopt its two rules, and (2) the effect of those rules. A review of the trial court's declaratory judgment reveals that these issues involved pure questions of law.

The first of the trial court's five declarations stated that R.C. 343.01(G) empowered the District to adopt, publish, and enforce Rule 2–393. The trial court's second declaration stated an identical conclusion concerning Rule 3–393. These two declarations were based upon statutory construction and did not require the trial court to resolve any genuine issue of material fact. As we noted earlier, these rules require all developers to submit general plans demonstrating a proposed facility's compliance with the District's solid waste management plan. They also prohibit the construction of any facility not complying with the District's plan and not receiving the District's approval.

Having determined that the District could adopt rules requiring Danis's compliance with the District plan, the trial court next declared that the District could consider its siting criteria when reviewing Danis's proposal. The court presumably reached this conclusion because the District plan provides that its siting strategy "will guide the District in identifying the location of all new solid waste management facilities within the district." District Plan at Part IV.2(b). Thus, this third declaration was a logical extension of the trial court's first two rulings, and, like them, it did not require the resolution of any factual disputes.

Similarly, the trial court's fourth declaration simply stated a logical conclusion flowing from its three prior rulings. Specifically, the court held that the District must follow its siting strategy when determining whether Danis's general plans and specifications comply with the District's plan. This declaration only restates the language of the District plan, read in conjunction with Rules 2–393 and 3–393, which the trial court already had declared validly adopted.

Finally, the trial court's fifth declaration stated that any proposed sanitary landfill found unacceptable by the District plan's siting strategy "is not in compliance with the Clark County Solid Waste Management Plan." This self-evident statement carried the trial court's analysis to its logical conclusion and did not involve any genuine issues of material fact. In this declaration, the trial court explained, quite logically, that any facility violating a portion of the District plan would not comply with the plan.

Consequently, we find no genuine issues of material fact that should have prevented the trial court from rendering its summary declaratory judgment. Danis's requested discovery related to "the District's reasons for adoption and application, and selective enforcement of its [r]ules." However, the trial court's declaratory ruling addressed the District's *authority* to adopt its rules and to subject Danis's proposed facility to its siting strategy, not its *motivation* for doing so. If Danis perceives at a later date that the District is applying its siting strategy fraudulently or in bad faith, Danis remains free to challenge the District's conduct at that time. Such a challenge, however, is irrelevant to the District's *authority*, under the Revised Code and its own plan, to apply its siting criteria to Danis. Therefore, we overrule Danis's third assignment of error.

In its final assignment of error, Danis contends that the trial court erred when it ruled that any proposed landfill found unacceptable under the District's siting strategy does not comply with the District's plan. Danis's final assignment of error states:

"ASSIGNMENT OF ERROR NO. 4: The trial court overstepped its authority in declaring that any proposed sanitary landfill that may be found unacceptable by the siting procedures and criteria in Part II, Section 8.b of the Plan is not in compliance with the Plan."

In this assignment of error, Danis argues that no "definite and concrete controversy" exists to support the trial court's broad and prospective ruling. In support of its argument, Danis suggests numerous factual scenarios under which the District improperly may reject Danis's proposal as violative of the District's siting strategy.

For example, Danis contends, the District could find insignificant noncompliance with its plan, succumb to local pressure to reject the landfill, base its

decision upon a coin flip, or ground its decision upon any number of other improper factors. Given the "wide range of possible situations on which the validity of the District's decision could turn," Danis asserts the absence of a definite and concrete controversy "sufficient to support a declaratory judgment on the legality of that as yet unmade decision." Moreover, Danis argues, the trial court's fifth declaration "could mean that *any* finding by the Clark County Solid Waste Management District that the proposed sanitary landfill is not in compliance with the Plan is binding upon Danis, *no matter how arbitrary or unfounded* the evaluation and conclusion."

█ We disagree. A grant of declaratory judgment is proper when (1) a real controversy exists between adverse parties, (2) the controversy is justiciable, and (3) speedy relief is needed to preserve rights that otherwise may be impaired. *Fairview Gen. Hosp. v. Fletcher* (1992), 63 Ohio St.3d 146, 148–149, 586 N.E.2d 80, 82–83. In the present case, the trial court determined the construction, validity, and effect of District Rules 2–393 and 3–393, and all three prerequisites for a declaratory judgment were satisfied when the trial court made its decision.

First, a real controversy existed concerning the District's authority to subject Danis's proposed facility to the District's siting strategy. Danis and the District undeniably were at odds on this issue and, therefore, were adverse parties.

Second, the controversy between Danis and the District was justiciable. The relevant Revised Code provisions and District rules were in effect. As the District notes, it simply requested the trial court "to construe the effect of the interplay among these provisions and delineate the District's obligations under them." The Ohio Supreme Court has held that declaratory relief is an appropriate means of construing and testing the validity of statutes, ordinances, or regulations. *Burger Brewing Co. v. Liquor Control Comm.* (1973), 34 Ohio St.2d 93, 96–97, 63 O.O.2d 149, 150–151, 296 N.E.2d 261, 263–264.

Finally, speedy relief was necessary to preserve the District's ability to enforce its rules to the extent authorized by law. The District argues that before the trial court's ruling it faced potential lawsuits from Danis if it enforced its rules and from various citizen groups if it did not. Consequently, the District sought declaratory relief to resolve this conflict and identify the scope of its rulemaking authority. We agree with the District that declaratory judgment was designed "to lift the people from the horns of such a dilemma."

█ Furthermore, we cannot accept Danis's contention that the trial court's ruling insulates the District from judicial review of potentially arbitrary decisions. Danis suggests that the trial court's ruling grants the District *carte blanche* to find a proposed facility in violation of its siting strategy for trivial reasons and then to reject the facility for noncompliance with the District plan. In its fifth

declaration, however, the trial court simply recited the logical conclusion flowing from its other rulings. The trial court did not insulate from judicial review a District decision concerning a proposed facility's compliance with the District's siting strategy and, consequently, its compliance with the District plan as a whole.

Indeed, as the District notes, if Danis or any other potential developer objects to the District's plan-compliance decisions, that developer remains free to challenge the District's determination in court. At that time, the developer can cite any perceived shortcomings in the District's evaluation process or assert claims of fraud or bad faith stemming from the District's application of its siting strategy. The trial court's declaratory judgment does nothing to hamper a developer's ability to challenge arbitrary District rulings. Consequently, we overrule Danis's fourth assignment of error.

However, having sustained Danis's second and the OEPA's first assignment of error, we reverse those portions of the trial court's judgment allowing the District to demand Danis's compliance with its siting strategy. Although we hold that the District may subject *all* proposed solid waste disposal facilities to siting criteria, the District's criteria before us violate R.C. 343.01(G)(2)'s prohibition against establishing design standards.

Therefore, we affirm the trial court's first two declarations allowing the District to enforce rules requiring developers (1) to submit plans demonstrating compliance with the Clark County Solid Waste Management Plan, and (2) to receive District approval before constructing a sanitary landfill. Despite its adoption of these rules, however, the District may not follow its siting procedure and criteria when determining whether Danis's plans comply with the Clark County Solid Waste Management Plan. As we explained above, that siting strategy improperly allows the District to establish design standards. Consequently, we reverse the trial court's third and fourth declarations. Finally, having declared the District's siting procedure invalid, we also reverse the trial court's fifth declaration. The District's Part II, Section 8 "Siting Procedure C" may not be used to determine Danis's compliance with the Clark County Solid Waste Management Plan.

*Judgment affirmed in part*
*and reversed in part.*

WOLFF and FAIN, JJ., concur.