94 F.3d 645
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Carol A. SIMPKINS, Plaintiff-Appellant,
v.
SPECIALTY ENVELOPE, INC., Defendant-Appellee.
 No. 95-3370.
 United States Court of Appeals, Sixth Circuit.
 Aug. 9, 1996.
 
 Before: MILBURN and BOGGS, Circuit Judges; and QUIST, District Judge*.
 PER CURIAM.
 
 
 1
 Carol A. Simpkins appeals from a grant of summary judgment to her employer, Specialty Envelope, Inc. ("Specialty"), the defendant in this suit based primarily on the Americans with Disabilities Act ("ADA"). We affirm the district court opinion in its entirety.
 
 
 2
 * Simpkins started working for Specialty in August 1992, after Specialty's predecessor, Western Paper Co., was purchased by Specialty out of receivership. She had been employed by Western Paper for 20 years. She started out as a machine operator and in 1988 was promoted to Personnel Director, a position that she held for a time even after Western Paper changed ownership. Simpkins asserts, and Specialty does not contest, that her performance was always rated highly while she worked for Western Paper. The first indication contained in the record that her work performance for Specialty was substandard occurred on the day before her employment with Specialty ended.
 
 
 3
 Sometime during Simpkins's tenure as Personnel Director, Sam Venanzio became General Manager of Specialty. Venanzio appointed Michelle Hughes, whom he later married, to the position of Director of Administration. After Hughes became Director of Administration, she demoted Simpkins to Order Entry Clerk. Simpkins was given the choice of accepting this demotion or losing her job; she chose the former option. She continued to handle most of her personnel duties, however. At one point, Simpkins went to speak to Venanzio about her demotion and Venanzio assured her that she was a valuable worker whom he would not "even consider" letting go. Simpkins alleges that she feared that she was being pushed out of the company by Venanzio who wanted to replace her with Hughes. She also claims that Venanzio began to avoid her around the office, having "washed his hands" of her. Hughes told Simpkins that Venanzio did not want to deal with her anymore, and that if Simpkins could not get along with Hughes, she should quit. Eventually, Hughes assumed some of Simpkins's personnel duties.
 
 
 4
 Simpkins then began handling customer service matters in addition to working on the personnel responsibilities that remained part of her job. During this period, she was working 10-12 hour days. Later, billing was added to her responsibilities. Around this time, two of Simpkins's co-workers were made her supervisors--Teresa Hall and Ginger Lawless. A sister of one of these supervisors was brought into Specialty to take over some of Simpkins's functions. Simpkins claims that Specialty was heaping more work on her and bestowing rewards upon others, in an attempt to force her out of the company.
 
 
 5
 On Friday, October 9, 1992, Hall and Lawless asked Simpkins to meet with them to discuss various alleged problems with her work performance. Though she had never been admonished in such a fashion before, Simpkins was given a "final" warning by Hall and Lawless. After this meeting, Simpkins returned to her work station, became extremely agitated when a co-worker asked her what was wrong, and ran into the bathroom. While there, Simpkins cried and beat on the walls. She then ran through the sales department, away from her work station, to a park bench outside the building where Specialty Paper was located, stuffing tissues in her mouth to keep from screaming. Later she returned to the plant and attempted to call her husband so that he would come to pick her up and take her home. When neither Simpkins nor Specialty Production Manager Lou Woerner were able to reach her husband, Simpkins was taken home by Deborah Gladwell, a manager in the shipping department. Gladwell described Simpkins as shaking, hysterical, and repeatedly striking herself with clenched fists.
 
 
 6
 Woerner gave Simpkins permission to go home. Simpkins had not asked permission to go home from either of her direct supervisors, Hall or Lawless, however, allegedly because of her emotional condition. Simpkins claims that Lawless and Hall were unavailable at the relevant time, a fact supported by Woerner's deposition. A co-worker told Lawless that Simpkins had left work. When Woerner told Venanzio of Simpkins's breakdown and departure from work, Venanzio responded, "OK."
 
 
 7
 Larry Simpkins, Carol Simpkins's husband, returned home to find his wife hysterical and hyperventilating, "jamming food in her like there was no more." He immediately called a doctor. The doctor prescribed medicine to Simpkins to calm her down, but this remedy did not have the desired effect. Larry Simpkins then took his wife to a hospital, where another doctor referred her to a psychiatric hospital. Later, Larry Simpkins called his niece, Tracy Farrell, who also worked at Specialty, and asked her to bring to his home his wife's book, sweater, and coffee cup, which his wife had left at work. At the end of Friday, October 9, 1992, Venanzio sent a memorandum to Hughes stating that Carol Simpkins's departure without notification to her direct supervisors constituted her resignation.
 
 
 8
 On the following Monday, October 12, 1992, at a time Specialty claims was later in the morning than Carol Simpkins was scheduled to begin work, Larry Simpkins called Specialty and informed Venanzio that his wife had been hospitalized and would not be able to work for several days. Before receiving Larry Simpkins's call, however, Specialty had determined that Carol Simpkins had resigned because she left the building without the permission of her immediate supervisors. Larry Simpkins insisted to Venanzio that his wife had not quit and that she planned to return once she was out of the hospital. Venanzio told Larry Simpkins this would not be possible, as Carol Simpkins was no longer an employee of Specialty. Venanzio then circulated a second memorandum detailing his conversation with Larry Simpkins. In this memorandum, Venanzio again noted that it was a violation of company policy for Simpkins to have left the workplace without the permission of her direct supervisor. There is undisputed evidence in the record that Specialty had terminated three other workers for this same infraction of the company's rules. After circulating the memorandum, Venanzio moved quickly to cancel Simpkins's health insurance.
 
 
 9
 Two days later, on October 14, 1992, Simpkins was released from the hospital. She began looking for another job on October 23, 1992. Simpkins said she felt like she was ready to work at that time. Simpkins claims that she has continued psychiatric treatment when she could afford it and that she takes Prozac daily to control her depression. Neither Simpkins nor anyone else on her behalf requested that Specialty reinstate her to her former position. She never told anyone at Specialty that she was suffering from a disability or that a doctor had diagnosed her as having had a major depressive episode.
 
 
 10
 After she was terminated, Simpkins remained unemployed for about one year. She then worked part-time at a bakery for several months before finding full-time employment, including fringe benefits, at the Biggs Grocery Store for $3.70 per hour less than she was earning at Specialty. Simpkins never missed any work at the bakery or Biggs Grocery due to depression.
 
 
 11
 Dr. James Mulderig diagnosed Simpkins as having had a major depressive episode leading up to and including the October 9 incident. He opined that she was not aware of her depression and so could not have told Specialty about it, or asked for any accommodation. Simpkins claims that Lawless's deposition supports the conclusion that people at Specialty were aware that she was "not herself" before the incident. However, Lawless's deposition does not support this assertion. In fact, Simpkins admitted that she had never told anyone at Specialty anything that would lead them to believe that she was unable to perform her normal daily function because of some mental problem or disability that she had. Moreover, Simpkins responded in the negative to the following question when she was deposed: "Do you have any reason to think that other people at work, before October 9, knew that you were suffering from a condition that made you unable to perform your normal work functions?"
 
 
 12
 On September 2, 1993, Simpkins filed a complaint alleging that she had been discriminated against under the ADA and the Ohio Civil Rights Act. Additionally, her complaint asserted various other theories to support a recovery under Ohio law, including a defamation claim related to the circulation of Venanzio's memorandum about the circumstances of her termination, a breach of contract and/or promissory estoppel claim, and a claim for intentional infliction of emotion distress. Specialty filed a motion for summary judgment on May 10, 1994, which the district court granted on February 17, 1995.
 
 II
 
 13
 We review grants of summary judgment de novo. Baggs v. Eagle-Picher Indus., Inc., 957 F.2d 268, 271 (6th Cir.), cert. denied, 113 S.Ct. 466 (1992). We must affirm only if we determine that the pleadings, affidavits, and other submissions show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When evaluating an appeal of this nature, we view the evidence in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
 
 
 14
 One of the major problems with the district court's opinion in this case is that it did not make explicit the basis of its jurisdiction over Simpkins's state law claims. Simpkins's complaint does not allege diversity jurisdiction and in fact asserts the existence of "pendent jurisdiction," now known as supplemental jurisdiction. 28 U.S.C. § 1367(a). Therefore, we assume that only supplemental jurisdiction exists in this case. Given that the district court granted summary judgment to Specialty with respect to Simpkins's only federal law claim, it should have gone on to consider whether it was appropriate to dismiss her pendent state law claims without prejudice. "It is generally recognized that where, as in this case, federal issues are dismissed before trial, district courts should decline to exercise jurisdiction over state law claims." Gaff v. FDIC, 814 F.2d 311, 319 (6th Cir.1987) (citing United Mine Workers v. Gibbs, 383 U.S. 715 (1966)).
 
 
 15
 Here, we will address Simpkins's pendent state law claims because of the extensive discovery that has taken place. See Taylor v. First of Amer. Bank-Wayne, 973 F.2d 1284, 1288 (6th Cir.1992) (district court properly exercised supplemental jurisdiction when case had been on court's docket for nearly two years and parties had completed discovery, compiling an enormous record). Important to our decision not to remand was the fact that both Simpkins and Specialty urged us to reach the state law issues in this case. We note, however, that we address the merits of Simpkins's state law claims reluctantly. The discretion involved in exercising supplemental jurisdiction has been reposed in the district courts. We will normally review an exercise of supplemental jurisdiction for abuse of that discretion and remand if a district court does not indicate what motivated its decision to exercise supplemental jurisdiction when all federal question claims have been dismissed prior to trial. See Hankins v. The Gap, Inc., 84 F.3d 797, 802 (6th Cir.1996) (abuse of discretion review). District courts should follow the normal procedure of providing reasons for exercising supplemental jurisdiction when choosing to do so contrary to the general rule in favor of dismissing without prejudice pendent state law claims when the basis for federal question jurisdiction is eliminated before trial.
 
 A. ADA & OHIO CIVIL RIGHTS ACT
 
 16
 Simpkins's first state law claim under the Ohio Civil Rights Act, Ohio Rev.Code Ann. ch. 4112 (Baldwin 1995), is essentially similar to her claim under the ADA, and the results of our analysis would not be altered in the Ohio state law context.
 
 
 17
 In granting summary judgment to Specialty on Simpkins's ADA claim, the district court relied on Equal Employment Opportunity Commission ("EEOC") regulations inapplicable to this case. See, e.g., Mem.Op. at 9 (citing to 29 C.F.R. Pt. 1613). Part 1613 of the regulations issued by the EEOC governs only federal workers. See 29 C.F.R. § 1613.201(b) (July 1, 1995) (now rescinded). We may, however, affirm the district court's decision on any ground, not merely those it relied upon. Russ' Kwik Car Wash, Inc. v. Marathon Petroleum, 772 F.2d 214, 216 (6th Cir.1985) (per curiam).
 
 
 18
 In order to maintain a claim under the ADA, Simpkins must establish that she is disabled. The ADA defines the term "disability" as a " physical or mental impairment that substantially limits one or more of the major life activities of [an] individual[,] a record of such impairment[,] or being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C); Ohio Rev.Code Ann. § 4112.01(a)(13) (providing definition of "handicap" very similar to ADA definition of "disability"). Regulations under the ADA define "a physical or mental impairment" as including "any mental or psychological disorder." 29 C.F.R. § 1630.2(h). A "major life activity" includes working. 20 C.F.R. § 1630.2(i).
 
 
 19
 Simpkins's claim is barred under any of the three definitions of disability, however, because an employer who discharges an employee without knowledge of the employee's disability is not liable under the ADA. An employer must discriminate against an employee "because of" that employee's disability in order to violate the ADA. 42 U.S.C. § 12112(a). (See Ohio Rev.Code Ann. § 4112.02(a) (Baldwin 1995) (also using "because of" language); Lillback v. Metropolitan Life Ins. Co., 640 N.E.2d 250, 258-59 (Ohio Ct.App.1994) (plaintiff was suffering from a handicap but could not recover, as he was not discharged "because of" that handicap).) Cf. John Flynn, Note, Mixed-Motive Causation under the ADA: Linked Statutes, Fuzzy Thinking, and Clear Statements, 83 Geo.L.J. 2009, 2051 (1995) (the text and legislative history of the ADA is best read to require "but-for" causation, not mixed-motive causation).[1] "Employers are obligated to make reasonable accommodation only to the physical or mental limitations resulting from the disability of a qualified individual with a disability that is known to the employer. Thus, an employer would not be expected to accommodate disabilities of which it is unaware." 29 C.F.R. Pt. 1630 (App.). See also Hedberg v. Indiana Bell Tel., 47 F.3d 928, 932-34 (7th Cir.1995) ("The ADA does not require clairvoyance.") Cf. Landefeld v. Marion Gen. Hosp., Inc., 994 F.2d 1178, 1181 (6th Cir.1993) (Rehabilitation Act of 1973 ("Rehabilitation Act") plaintiff must establish discrimination "solely on the basis of" handicap--no liability where employer had no knowledge of a mental disability); Hamm v. Runyon, 51 F.3d 721, 725 (7th Cir.1995) (ADA borrows heavily from Rehabilitation Act and therefore it can be used as an interpretive guide to questions arising under the ADA).
 
 
 20
 It is undisputed that Simpkins never requested any accommodation and never specifically told Specialty that she was disabled. She even admitted that she had no reason to think that anyone at Specialty knew that she was disabled. Of course, Dr. Mulderig indicates that Simpkins did not know she was suffering from a mental disability until after the October 9 incident occurred. But the time for the Simpkinses to have informed Specialty of Carol Simpkins's disability was as soon as practicable after the onset of that disability. Neither Carol nor Larry Simpkins did so. We reject Simpkins's argument that her husband's phone call to Venanzio constituted a constructive request for an accommodation. It may have been a request for an "accommodation" of what the record shows Specialty could have had assumed was a temporary illness, but the phone call was not a request for an "accommodation" of a "disability" protected under the ADA. Larry Simpkins simply did not tell Specialty that his wife had a "major depressive episode" and request that this disability be accommodated. Specialty had no knowledge that Simpkins was disabled within the meaning of the ADA, and therefore it was under no duty to construe a request for an exception from company policy as a request for the accommodation of a disability. Therefore, Simpkins's claim under any of the three ADA categories of disability must fail.
 
 
 21
 The district court's grant of summary judgment to Specialty in relation to the ADA issue also must be upheld because Simpkins's claims that she falls into the first category of disability under the ADA--having a "substantial[ ] limit[ation on] one or more of [her] major life activities"--are weak. Her disability was only a temporary, non-chronic impairment. These kinds of impairments are not sufficient to trigger category one disability under the ADA. See 29 C.F.R. § 1630.2(j)(2)(ii) (courts may consider the duration or expected duration of the impairment under the ADA in deciding whether a claimant is "substantially limit[ed]" in performing "major life activities"); Margeson v. Springfield Terminal Ry., No. CIV.A. 91-11475-Z, 1993 WL 343676, at * 5 (D.Mass. Aug. 24, 1993) (plaintiff under Rehabilitation Act with stress-related panic disorder who needed to make visits to the emergency room, to doctors, to participate in stress management therapy, to cancel a family vacation, and occasionally beabsent from work had no substantial limitation on his ability to work).
 
 
 22
 Simpkins's claim for category one disability also fails because she indicated that she was able to return to work one week after the October 9 incident and has not missed a single day of work due to her alleged disability at the bakery or at the Biggs Grocery. Simpkins attempts to respond to this argument by pointing to an Appendix issued by the EEOC to aid in the interpretation of the ADA. Simpkins claims that the Appendix establishes that her disability should be judged without considering the effects of the medicine she takes to control her depression. See 29 C.F.R.App. Pt. 1630. When discussing 29 C.F.R. § 1630.2(h), this Appendix notes: "The existence of an impairment is to be determined without regard to mitigating measures such as medicines, or assistance or prosthetic devices." 29 C.F.R.App. Pt. 1630. (The ADA seems to differ in this respect from the Rehabilitation Act and therefore Specialty's citation to Mackie v. Runyon, 804 F.Supp. 1508, 1510 (M.D.Fla.1992) (bi-polar disorder stabilized by medicine and therefore not a "handicap"), is inapposite.) However, merely because an individual is taking some medicine does not prove that the individual has a "disability" for purposes of the ADA. Roth v. Lutheran Gen. Hosp., 57 F.3d 1446, 1454 (7th Cir.1995). This interpretive guidance provided by the EEOC in its Appendix does not help Simpkins here because she has not produced any evidence regarding her ability to work or perform any major life activities without the use of Prozac. Simpkins must do more than show that there is some "metaphysical doubt as to the material facts." She must come forward with "specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 586-87. In Castorena v. Runyon, 65 Fair Empl.Prac.Cas. (BNA) 74, 1994 WL 146343 (D.Kan. April 4, 1994), a district court granted summary judgment against an ADA plaintiff who had alleged that the only effect that she experienced when she stopped taking her medicine was that she became "a little fuzzy around the edges." Simpkins has not alleged any effects that she would experience if she stopped taking Prozac. As a result, she has not met her burden under Fed.R.Civ.P. 56 to avoid summary judgment in this case.
 
 
 23
 Simpkins argues that she has relatively strong evidence showing that Specialty's explanation for terminating her--that she left work without notifying her immediate supervisors--is pretextual. Assuming this to be true, which it is not, the evidence that Simpkins has presented of pretext is not evidence of a pretext for discrimination against her on the basis of the disability she alleges. The record conveys a strong sense that Simpkins was treated unfairly by Specialty and that she may indeed have been driven out of the company merely because of personal friction with Venanzio's wife, Hughes. However, there is no evidence in this case that Specialty concocted its explanation for terminating Simpkins because it knew that Simpkins was suffering from a major depressive episode, the most important reason for upholding the district court's grant of summary judgment in this case.
 
 B. DEFAMATION UNDER OHIO LAW
 
 24
 Simpkins points to the following separate communications that she alleges were defamatory, which provide in relevant part:
 
 OCTOBER 9 MEMORANDUM
 
 25
 [Carol] left the company premises without notification to or compliance with supervision [sic ]. This act is considered her resignation. Due to her departure and the nature of her work ethics, she is not to be reviewed for future employment.
 
 OCTOBER 12 MEMORANDUM
 
 26
 [Venanzio] informed Mr. Simpkins that because of her departure on Friday, October 9, 1992, without any prior notification to management ... her action was considered a resignation.
 
 
 27
 Statements alleged to be defamatory, yet made in good faith between an employer and an employee, or between two employees concerning a third employee, are protected by a qualified privilege that a plaintiff can only overcome by producing proof of actual malice. Evely v. Carlon Co., Div. of Indian Head, Inc., 447 N.E.2d 1290, 1292 (Ohio) (per curiam); Hanly v. Riverside Methodist Hosps., 603 N.E.2d 1126, 1131 (Ohio Ct.App.1991). Simpkins does not argue that the scope of distribution for these memoranda vitiates the qualified privilege. For instance, Simpkins does not contend that the allegedly defamatory memoranda were made to non-employees, or to employees who had no legitimate reason to learn of Simpkins's dismissal. Rather, Simpkins argues that the memoranda were known to be false and were made with actual malice.
 
 
 28
 Simpkins cannot demonstrate the falsity of the memoranda. While it may have been false for Venanzio to have written in the October 12 memorandum that Simpkins had walked off the job for failing to notify anyone, because Simpkins had notified Woerner, Venanzio specifically noted in the October 9 memorandum that Simpkins had not notified her own supervisors. In the October 12 memorandum, he used the more general term "management," but especially since this second memorandum followed on the heels of the first, it would be hyper-technical for us to conclude that because Woerner was a manager, the second memorandum was untrue. In context, the only conclusion that can be reached is that Venanzio was using the term "management" to refer to himself. Thus, Specialty can successfully assert the qualified privilege and is entitled to summary judgment on Simpkins's defamation claim. Simpkins has introduced no evidence to support her claim that the statements quoted above were made with actual malice, which requires a demonstration that Specialty knew the statements were false when they were made. Hanly, 603 N.E.2d at 1131.
 
 
 29
 C. BREACH OF CONTRACT/PROMISSORY ESTOPPEL UNDER OHIO LAW
 
 
 30
 Simpkins argues that Specialty had a policy not to discipline or dismiss employees except with good cause. Joining this with a contention that Specialty did not have good cause to dismiss her, she claims that she is entitled to relief either on a breach of contract or promissory estoppel theory. She relies on Mers v. Dispatch Printing, 483 N.E.2d 150, 152-54 (Ohio 1985), for the proposition that a mere "company policy" can constitute evidence of an employment contract and therefore defeat the presumption that an employee is only an at-will employee. It is undisputed, however, that Specialty has a policy of terminating workers who walk off the job or are absent without informing their direct supervisors. It is also undisputed that when Simpkins left on October 9, she did not tell her immediate supervisors, Hall or Lawless, or request their permission to leave. Furthermore, it is undisputed that other employees had been terminated for similar infractions of the company's policy. Therefore, even if a contract was created by the employment manual here and by company policy, there was no violation of that policy in this case and so there can be no action under Ohio law for either an implied breach of contract or promissory estoppel.
 
 
 31
 Simpkins's claim also fails under Ohio cases like Walden v. General Mills Restaurant Group, Inc., 508 N.E.2d 168, 171 (Ohio 1986) (employee could be terminated for refusing to take a polygraph test because the administration of such a test protected the interests of the employer). Specialty's policy of requiring employees to inform direct supervisors before leaving the workplace similarly promotes its interests. Employers are obviously entitled to establish anti-absenteeism policies. And it is not irrational for such a policy to require that an employee inform a direct supervisor before leaving or missing work, because a direct supervisor is more likely than a manager further up the company's hierarchy to know what impact such an absence will have on the company's productivity, and is also more likely to need the absence information.
 
 
 32
 D. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER OHIO LAW
 
 
 33
 It is very difficult to show that one has been subjected to the tort of the intentional infliction of emotional distress. Liability for this tort attaches only to those "who by extreme and outrageous conduct intentionally or recklessly cause[ ] serious emotional distress to another...." Russ v. TRW, Inc., 570 N.E.2d 1076, 1082 (Ohio 1991) (quoting Yeagher v. Local Union 20, 453 N.E.2d 666 (1983) (syllabus)). A reasonable fact-finder might conclude that Simpkins was treated unfairly in this case by her employer of over 23 years. However, the conduct here, even taking Simpkins's theory of the case that Venanzio and Hughes forced her out of the company because of a personality conflict, was not so outrageous as to shock the conscience and cross the threshold required to show an intentional infliction of emotional distress. See, e.g., Hanly, 603 N.E.2d at 1132 (discharging a worker accused of sexual harassment did not constitute an intentional infliction of emotional distress, because this was a reasonable company policy); Mullholand v. Harris Corp., 72 F.3d 130, 1995 WL 730466 at ** 7 n. 1 (6th Cir.1995) (unpublished per curiam) (discussing Ohio's tort of intentional infliction of emotional distress based on the Restatement (Second) of Torts § 46) (citing Pratt v. Brown Machine, 855 F.2d 1225, 1238-42 (6th Cir.1988) (where facts were egregious enough to establish tort occurred)). Here, the employer had a reasonable company policy prohibiting an act that Simpkins engaged in--it is simply not unconscionable to enforce such a policy, even where one suspects that there was more than a desire to enforce the policy motivating the employer in taking the actions it did. Simpkins cites Pater v. Health Care & Retirement Corp., 808 F.Supp. 573, 579 (S.D.Ohio 1992) (declining to dismiss intentional infliction of emotional distress claim), but either ignores, or fails to realize, that Pater was a case dismissed at the Fed.R.Civ.P. 12(b)(6) stage. Obviously, the standard for dismissal is stricter at that stage of procedural review.
 
 III
 
 34
 The district court's grant of summary judgment to Specialty is AFFIRMED.
 
 
 
 *
 The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 The Sixth Circuit has not yet addressed the question of whether the ADA requires "but-for" causation, or permits mixed-motive analysis. In Maddox v. University of Tenn., 62 F.3d 843, 846-48 (6th Cir.1995), the court suggested that the standard of causation under the ADA is identical to the "but-for" causation standard clearly required by similar language in the Rehabilitation Act