LILLBACK, Appellant,

v.

METROPOLITAN LIFE INSURANCE COMPANY, Appellee.

[Cite as *Lillback v. Metro. Life Ins. Co.* (1994), 94 Ohio App.3d 100.]

Court of Appeals of Ohio,
Montgomery County.

No. 14085.

Decided March 30, 1994.

*Larry G. Lillback,* pro se.

*Freund, Freeze & Arnold* and *Francis S. McDaniel,* for appellee.

FREDERICK N. YOUNG, Judge.

Larry G. Lillback appeals from the trial court's grant of summary judgment to Metropolitan Life Insurance on both of Lillback's claims. In the first branch of his complaint, Lillback alleged that he relied on Metropolitan's representations to him that he could draft wills and trusts for clients as well as sell them policies of life insurance and investments. He claimed that these representations persuaded him to continue working for Metropolitan when he otherwise would have been engaged in a lucrative law practice. He further complained that Metropolitan's refusal to issue policies to clients for whom Lillback had drafted legal documents and Metropolitan's order to him to stop drafting legal documents for Metropolitan clients deprived him of bonuses he should have earned for selling the insurance policies. In his second claim, Lillback complained that no reasonable accommodation was made for him when he suffered a lumbosacral sprain, and, as a result, he was not able to meet his sales quota and was dismissed. He alleged that Metropolitan's conduct violated the Americans with Disabilities Act and Ohio's R.C. 4112.02.

The facts of this case are discussed in greater detail as they are relevant to the assignments of error below.

I

Lillback's fifth assignment of error brings up a threshold issue which we will address first:

"The trial court erred in following its trial order of discovery and the considering and granting of the defendant's motion for summary judgment."

The trial court, in its February 11, 1993 pretrial order, set a deadline for discovery at September 17, 1993. At the same time, it set August 1, 1993 as the deadline for either party to file motions for summary judgment. A trial by jury was scheduled for the week of October 18, 1993. Metropolitan made its motion for summary judgment May 4, 1993, which the court granted on June 11.

Lillback's awkwardly stated fifth assignment seems to allege error in the granting of summary judgment before the time set aside for discovery had

expired. Lillback complains that it was not only unreasonable for the court to have required motions for summary judgment to be filed before discovery had to be completed, but also that the court should never have entertained Metropolitan's May motion, as it was brought some four months before the discovery deadline—before Lillback had succeeded in deposing some out-of-state witnesses—and was therefore grossly premature.

In its pretrial order, the court explained that the early cut-off date for motions for summary judgment was not set to discourage settlement or other pretrial disposition of the case, but to ensure that such a disposition could be made early enough to permit hearings for other matters to be moved up in the court's calendar. As such, the summary judgment deadline represents a perfectly reasonable attempt by the court to efficiently control its docket.

Obviously, the deadline for discovery was set without reference to the deadline for filing summary judgment motions, and the fact that the summary judgment deadline came first may have presented a greater possibility that a motion for summary judgment would be brought and heard before both parties had completed their discovery. The court's calendar arrangement did not dictate such a result, however, and the placement of one date before the other, in and of itself, was not prejudicial error.

■ Parties who find themselves in the position of having to respond to a motion for summary judgment before adequate discovery has been completed must seek their remedy through Civ.R. 56(F):

"Should it appear from the affidavits of a party opposing the motion for summary judgment that he cannot for sufficient reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just."

Civ.R. 56(F) is invoked when a party opposing a motion for summary judgment files a motion, supported by affidavit, that explains that he cannot adequately oppose the motion because he cannot demonstrate sufficient facts to create a material issue, and that the court should therefore refuse to entertain the motion, or should grant him a continuance to permit him to marshal the necessary Civ.R. 56(C) evidence to justify his opposition to the motion. See *State ex rel. Coulverson v. Ohio Adult Parole Auth.* (1991), 62 Ohio St.3d 12, 14, 577 N.E.2d 352, 353–354; and *Stegawski v. Cleveland Anesthesia Group, Inc.* (1987), 37 Ohio App.3d 78, 86–87, 523 N.E.2d 902, 910–911.

In this case, Lillback failed to invoke Civ.R. 56(F) for any of the relief available in it. Not only did he fail to produce affidavits showing how a continuance would assist him in opposing Metropolitan's motion for summary judgment, but he made

no motion for a continuance at all. The only reference he made to inadequate discovery was in the concluding paragraph of his Resistance to Defendant's Motion for Summary Judgment, in which he asked the court to deny Metropolitan's motion as a sort of sanction for the "malicious actions of the defendant's attorney in an effort to hinder the discovery process." This statement, even if it had been supported by affidavit, would have been insufficient to invoke any of the remedies provided in the rule.

Accordingly, we find that this issue has not been preserved for review. *Stegawski v. Cleveland Anesthesia Group, Inc., supra,* 37 Ohio App.3d at 87, 523 N.E.2d at 911. Lillback's fifth assignment of error is overruled.

## II

Lillback's first four assignments of error are:

"I. The trial court erred in granting the defendant's motion for summary judgment in that there were facts which needed to be resolved by the trier of fact on both Counts I and II of the complaint;

"II. The trial court erred in granting the defendant's motion for summary judgment in that there were genuine issues as to material facts on both Counts I and II of the complaint;

"III. The trial court erred in granting the defendant's motion for summary judgment in that the defendant was not entitled to the judgment as a matter of law on both Counts I and II of the complaint;

"IV. The trial court erred in granting the defendant's motion for summary judgment based upon the fact that reasonable minds could not have come to but one conclusion, and that the conclusion could not have been adverse to the plaintiff on both Counts I and II of the complaint[.]"

His sixth assignment of error is:

"VI. The trial court erred in its application of *The Americans with Disabilities Act* to the facts in this case."

Each assignment of error contends that summary judgment was improvidently granted. In the interests of clarity and judicial economy, we will consider first whether summary judgment was proper for Lillback's fraudulent inducement or promissory estoppel claim, and next whether it should have been granted on his ADA and Ohio civil rights claims. The facts relevant to each claim are laid out below, and for each claim, we have adopted Lillback's most favorable construction of the facts.

A

Lillback is an attorney who was suspended from the practice of law in 1989 for misappropriating money. See *Lake Cty. Bar Assn. v. Lillback* (1989), 41 Ohio St.3d 13, 535 N.E.2d 300. During his suspension, he sought other employment. He responded to an advertisement placed by Metropolitan Life Insurance Company in The Dayton Daily News, seeking applicants to fill vacant positions in their management training program.

He subsequently spoke to a recruiting agent, Karen Brett, about the possibility of becoming a Metropolitan insurance agent. He had prospects, if he sold well, of advancing to a managerial position. In the meantime, he would earn bonuses and commissions based on the volume of sales he made. His initial base salary was also calculated based on the sales he was expected to make, and would be adjusted up or down each quarter to correspond to his sales record for the preceding quarter.

In January 1991, near the completion of the hiring process, Lillback discussed the parameters of his new position with Kevin Lattea. They discussed how Lillback's eventual reinstatement to the practice of law might affect his employment with Metropolitan. It was suggested that he might prepare legal documents such as wills and trusts "as a service for the people" who were prospective buyers of Metropolitan insurance policies. Lillback was ultimately hired as an insurance agent.

Lillback was reinstated to the practice of law April 18, 1991. *Lake Cty. Bar Assn. v. Lillback* (1991), 60 Ohio St.3d 608, 573 N.E.2d 592. He alleged in his complaint that he chose to continue working for Metropolitan after his reinstatement in the belief that he could engage in estate planning for Metropolitan clients and draft legal documents for them, and that had he not held this belief, he would have quit his employment with Metropolitan and entered private practice again.

Shortly after his reinstatement, Lillback spoke at a couple of seminars, apparently training seminars for Metropolitan account representatives, in which he was introduced to those assembled as an expert in the area of estate planning. He states that he was held out, and spoke freely of himself, as someone empowered to "work with" potential customers of life insurance products. Specifically, he alleged that he was authorized to prepare the company documents, wills, and trusts "needed to support the ownership of these policies."

Lillback drafted legal documents during the summer of 1991, from June to roughly September. Most of these documents were irrevocable trusts to complement life insurance policies he sold to Metropolitan clients. In his deposition, he testified about what typically took place during his encounters with potential clients:

"Q. And you on some occasions meet with private individuals as a sales representative for the purpose of selling life insurance and during those meetings, have the people executed trusts and wills?

"A. We probably executed trusts usually with the other representative being there. I would usually be brought in as a consultant.

"Q. Any other representative, private counsel for the individual?

"A. No, the other insurance representative.

"Q. Did you on occasion then during that period of time meet with members through [sic] the public and cause or contribute toward their executing trusts and wills without their being represented by their own counsel?

"A. I believe most cases either I am—I've met with attorneys for them or sometimes they have gone to talk to their own attorney and review it, and the attorney may have made document changes.

"Q. Were there cases where private counsel did not appear?

"A. Many times they were not present. Counsel was not there."

Lillback testified that he never held himself out to potential clients as an attorney, but only as a Metropolitan "estate planner." He also testified that he told clients for whom he drafted trusts or wills to "look at these documents, take them to their counsel, see that they were appropriate."

He stopped drafting legal documents about September 1991, when he received a telephone call from Edmund Rakowski of Metropolitan's New York office, asking him to stop representing individuals privately while selling them insurance, because it placed both Lillback and Metropolitan in an awkward ethical position. Rakowski also refused to issue life insurance policies for applicants for whom Lillback had drafted legal documents, though the applicants were otherwise qualified for the policies.

In January 1992, Lillback received a letter from Frank Senkowski, agency vice president, advising him that since September 1991, it seemed that he had prepared legal documents for at least one other client, though he had been told to stop, and that if he continued representing himself both as an attorney and as a Metropolitan account representative, he would be fired. In response to this letter, Lillback sought the advice of his own counsel, Jeffrey Silverstein. The outcome of that consultation was another letter, this one from William Howard of Metropolitan's law department, dated March 12, 1992. Howard's letter outlined in detail all of the potential violations of the Code of Professional Responsibility presented by Lillback's conduct, and additionally proposed that offering drafting services to potential insurance clients was a sort of rebate, and therefore violative of R.C. 3999.05.

In April 1992, Lillback received another letter from Rakowski, forbidding him to draft any more trusts or wills, and telling him to simply give clients company material suggesting estate planning options, which they could use in consultation with their attorneys, who would draft any necessary legal documents. Lillback was thoroughly persuaded by this time that Metropolitan would not countenance his acting as an estate planner in the sense understood by the legal community, and he agreed to abide by company policy. He did not leave Metropolitan at that time, but continued to work for it as an account representative until his employment was terminated in October 1992.

Lillback alleged that Metropolitan's refusal to issue policies of insurance for clients whose wills or trusts he had drafted caused him to lose benefits and commissions he should have earned by selling the insurance policies. Further, he alleged that he relied on Metropolitan's false representation to him that he could draft legal documents for potential clients once he was reinstated to the practice of law in April 1991, and was thereby persuaded to forgo the money he could have earned as an attorney in private practice and to continue working for Metropolitan. Lillback does not assign a specific name to the theory through which he seeks recovery, but his complaint most nearly describes a sort of fraudulent inducement to contract or promissory estoppel claim.

The standard for summary judgment is provided in Civ.R. 56(C):

"Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor."

Moreover, "[s]ummary judgment is a procedural device to terminate litigation and to avoid a formal trial where there is nothing to try." *Norris v. Ohio Std. Oil Co.* (1982), 70 Ohio St.2d 1, 2, 24 O.O.3d 1, 2, 433 N.E.2d 615, 621.

Before we analyze the merits of Lillback's fraud or promissory estoppel claim, however, we must examine whether the remedy he prays for is available to him as a matter of law and public policy. Essentially, he seeks the enforcement of a part of his employment agreement with Metropolitan whereby both he and Metropolitan would profit by his drafting legal documents for his insurance clients. As various agents for Metropolitan pointed out, this activity presented several possible violations of the Code of Professional Responsibility, and possibly

also ran afoul of R.C. 3999.05. If Lillback's employment practices were violative of any of these provisions, then the portion of his employment contract that he seeks to enforce would be void as contrary to public policy. See *Med Controls, Inc. v. Hopkins* (1989), 61 Ohio App.3d 497, 499, 573 N.E.2d 154, 155; *Xenia Bd. of Edn. v. Xenia Edn. Assn.* (1977), 52 Ohio App.2d 373, 377, 6 O.O.3d 425, 427, 370 N.E.2d 756, 758–759. See, also, *Garretson v. S.D. Myers, Inc.* (1991), 72 Ohio App.3d 785, 788, 596 N.E.2d 512, 514 (public policy is a legal principle which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare).

The record shows that Lillback drafted wills and trusts for insurance customers. As Howard indicated to him in his letter, this scenario presents serious conflicts of interest for Lillback, since he earned commissions based on his success in selling Metropolitan's products to members of the public. See DR 5–101(A): "Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, or property interests." Moreover, because it appears that Lillback was not compensated by the insurance customer for his legal services, but was compensated, if at all, by Metropolitan, his sales technique may have also violated DR 5–107(A)(1) and (2): "Except with the consent of his client after full disclosure, a lawyer shall not accept compensation for his legal services from one other than his client [or] accept from one other than his client any thing of value related to his representation of or his employment by his client." It would be improper for obvious reasons for Metropolitan to pay Lillback, or to encourage him with the prospect of greater commissions or bonuses, to give his clients a particular sort of advice or to render a particular kind of legal service. This concern is also echoed in DR 5–107(B): "A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services."

■ The threshold issue in this analysis is whether Lillback's drafting of trusts and wills for his insurance customers created an attorney-client relationship. Whether an attorney-client relationship exists is not governed solely by whether the person to whom advice is given or for whom service is rendered pays the attorney who gives the advice or renders the service. *Landis v. Hunt* (1992), 80 Ohio App.3d 662, 669, 610 N.E.2d 554, 558; and *Henry Filters, Inc. v. Peabody Barnes, Inc.* (1992), 82 Ohio App.3d 255, 260, 611 N.E.2d 873, 876. Though the districts of this state do not express the sine qua non of an attorney-client relationship in the same language, the consensus seems to be that such a relationship is governed by whether the putative client reasonably believed that he had entered into a confidential relationship with the attorney. See *Landis v.*

*Hunt, supra,* 80 Ohio App.3d at 669, 610 N.E.2d at 558: "An essential element * * * is the determination that the relationship invoked such trust and confidence in the attorney that the communication became privileged and, thus, the information exchanged was so confidential as to invoke an attorney-client privilege"; *Henry Filters, Inc. v. Peabody Barnes, Inc., supra,* 82 Ohio App.3d at 261, 611 N.E.2d at 876: "[T]he ultimate issue is whether the putative client reasonably believed that the relationship existed and that the attorney would therefore advance the interests of the putative client"; *David v. Schwarzwald, Robiner, Wolf & Rock Co., L.P.A.* (1992), 79 Ohio App.3d 786, 798, 607 N.E.2d 1173, 1180: "[W]here a person approaches an attorney with the view of retaining his services, an attorney-client relationship is created."

None of Lillback's former clients or customers is involved in this suit, and so for the purposes of this analysis the issue becomes whether an insurance customer for whom Lillback had drafted a will or a trust could have reasonably believed that he had entered into a confidential relationship with him. We find that a customer could have so believed. As Judge Fain of this court wrote in *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 62–63, 567 N.E.2d 1291, 1296:

"Seldom is the client's dependence upon, and trust in, his attorney greater than when, contemplating his own mortality, he seeks the attorney's advice, guidance, and drafting skill in the preparation of a will to dispose of his estate after death. These consultations are often among the most private to take place between an attorney and his client. The client is dealing with his innermost thoughts and feelings, which he may not wish to share with his spouse, children and other next of kin.

"Because the decisions that go into the preparation of a will are so inherently private, * * * a client is unusually dependent upon his attorney's professional advice and skill when he consults the attorney to have a will drawn."

We believe the same considerations apply to trusts that are drawn up to complement policies of life insurance. The insurance customers for whom Lillback drafted wills and trusts necessarily discussed with him matters that were inherently private and confidential, and relied on his expertise as an attorney to offer them guidance and advice in deciding how their property would be disposed of after their deaths. Hence, his customers could have reasonably believed that they had a confidential relationship with Lillback over and above the sort of relationship they would have had with an insurance agent who did not offer to draft legal documents for them. As discussed above, Lillback's fiscal interest in selling his customers insurance policies and other Metropolitan products may have conflicted with his duties to the same customers as their attorney.

The remaining step in this analysis is whether Lillback cured the conflict by gaining his clients' consent after a full disclosure of the conflict. See DR 5–

101(A) and *Cincinnati Bar Assn. v. Hartke* (1993), 67 Ohio St.3d 65, 68, 616 N.E.2d 186, 187–188; *Morgan v. N. Coast Cable Co.* (1992), 63 Ohio St.3d 156, 159, 586 N.E.2d 88, 90. The evidence on this point is less conclusive. Lillback testified that he was authorized to draft wills and trusts as a service to the customers, and that "many times" independent counsel was not present when he drafted these legal documents. However, he also testified that he told his clients that they should "look at these documents, take them to their counsel, [and] see that they were appropriate." While we do not find that this language vitiates any attorney-client relationship between Lillback and his customers, it may indicate that his clients were made aware of the conflict and that they nevertheless consented to his drafting of the wills or trusts for them. See *Cincinnati Bar Assn. v. Hartke, supra,* 67 Ohio St.3d at 68, 616 N.E.2d at 187: "[R]espondent could not comply with the full disclosure requirement in DR 5–104(A) without insisting Voelkel receive independent legal advice about the compromise. The panel, therefore, found that respondent had violated DR 5–104(A) by entering a business transaction with his client without sufficiently explaining that he would represent his own, rather than her, interests."

We are very concerned about attorneys in Lillback's position offering their clients legal advice and professional drafting skills in some of the most intimate and important matters that the clients will deal with in their lives, while at the same time cherishing fiscal interests potentially adverse to those of the clients whose interests they are sworn to zealously protect. Nevertheless, construing the evidence in a light most favorable to Lillback, we cannot say that Lillback clearly failed to cure the conflict by gaining his customers' consent after full disclosure.

■ R.C. 3999.05 brings up another matter. Ohio's anti-rebate statute forbids life insurance agents to "pay, allow, or give, or offer to pay, allow, or give, directly or indirectly, as an inducement to insurance, a rebate of the premium payable on a policy, * * * or a paid employment or contract for services of any kind, or any valuable consideration or inducement not specified in the policy of insurance."

Lillback drafted wills and trusts for insurance customers as they were "needed to support the ownership of these policies." Furthermore, Lillback's drafting skills were offered "as a service for the people." We find such conduct to be violative of R.C. 3999.05. Lillback's legal services were valuable consideration offered to potential Metropolitan insurance customers to facilitate their purchase of insurance policies. The legal services, moreover, could not have been specified in the policy of insurance without raising embarrassing questions about how Lillback came to be in business with Metropolitan Life Insurance Company to practice law.

For this reason, Lillback has no legal remedy available to him for Metropolitan's failure to continue to permit him to practice law for insurance customers in this way. His alleged agreement with Metropolitan to sell insurance for it if it would also let him draft legal documents for customers is unenforceable and void because it is contrary to the public policy articulated by the legislature in R.C. 3999.05. Metropolitan was obligated to order him to stop drafting for customers, and did so as soon as a knowledgeable agent discovered what Lillback was doing. The trial court was correct in granting Metropolitan summary judgment on Lillback's first claim.

Lillback's first through fourth assignments of error are overruled, as they apply to the first branch of his complaint. We will next consider the propriety of summary judgment on the second branch of his complaint, which alleged that Metropolitan failed to make accommodation for him when he was disabled with a lumbosacral sprain.

B

Lillback suffered injury to his lower back as a result of a December 1991 car accident. As a result, he took a leave from Metropolitan from January to April 6, 1992. When he returned to work in April, he continued to suffer from a lingering lumbosacral sprain and strain, which made some of his ordinary job activities difficult. Specifically, he alleged that he was not able to carry his computer with him on sales calls, because it weighed twenty-five pounds, and his doctor had advised him not to carry more than ten pounds until roughly October, to allow his lumbosacral injury more time to heal. He failed to meet his quarterly sales quota for two consecutive quarters as a result, and his employment was finally terminated in October 1992.

He complains that Metropolitan is at fault for failing to make necessary accommodation for his injury to enable him to carry on his usual sales activities, thereby violating "R.C. 4112.99 [sic, R.C. 4112.02]" and the Americans with Disabilities Act, Section 12112, Title 42, U.S.Code. He specifically contends that Metropolitan should have provided him with an agent-in-training to carry his computer on sales calls, or, alternatively, that it should have promoted him to a vacant position—incidentally, the position that he had his eye on since starting work there—for which he says he was well qualified, and which did not require him to sell any insurance.

We are satisfied that this court has jurisdiction to hear this matter under both statutes. Independent civil actions for alleged violations of the Ohio Civil Rights Act may be initiated in courts of common pleas, as this action was. See R.C. 4112.99; *Elek v. Huntington Natl. Bank* (1991), 60 Ohio St.3d 135, 138, 573 N.E.2d 1056, 1059. Further, there is nothing in the text of the Americans with

Disabilities Act affirmatively divesting state courts of jurisdiction over actions brought under it, nor do we discern any other reason to suppose that we do not have concurrent jurisdiction with federal courts to construe it. See *id.*

■ We will consider first the Ohio Civil Rights Act. R.C. 4112.02(A) forbids "any employer" to "discharge without just cause, to refuse to hire, or otherwise to discriminate against [a] person with respect to hire, tenure, terms, conditions, or privileges of employment" on the basis of that person's "race, color, religion, sex, national origin, handicap, age, or ancestry." The Ohio Civil Rights Act does not contain the "reasonable accommodations" language of Section 12112(b)(5)(A), Title 42, U.S.Code, so the issue is merely whether Metropolitan's treatment of Lillback was discriminatory. We observe that "[n]othing in divisions (A) to (E) of this section shall be construed * * * to require the employment or training of a handicapped person in a job that requires him routinely to undertake any task, the performance of which is substantially and inherently impaired by his handicap." R.C. 4112.02(L).

A lumbosacral sprain may satisfy the definition of "handicap" if it is "expected to continue for a considerable length of time, whether correctable or uncorrectable by good medical practice, which can reasonably be expected to limit the person's functional ability, including, but not limited to, * * * ambulating, * * * lifting, grasping, sitting, rising, any related function, or any limitation due to weakness and significantly decreased endurance, so that he can not perform his everyday routine living and working without significantly increased hardship and vulnerability to what are considered the everyday obstacles and hazards encountered by the nonhandicapped." Former R.C. 4112.01(A)(13).

The trial court did not make a finding on whether Lillback's injury was a "handicap" within the meaning of the statute, and Metropolitan disputes that Lillback was substantially limited when he returned to work in April. Nevertheless, assuming *arguendo* that Lillback suffers a "handicap" within the meaning of R.C. 4112.01(A)(13), he cannot prevail on his claim of discrimination as a matter of law.

We agree with the trial court's finding that Lillback was not discharged because he had a back injury. His position with Metropolitan required him to sell insurance policies and other Metropolitan products, and to sell them in predetermined quantities. His success in selling governed his base salary, what benefits he would be eligible for, and, ultimately, his continued employment. His salary was lowered, his benefits were reduced, and he was ultimately discharged because he was unable to meet his sales quota and not because he had suffered a disability injury. The trial court concluded that Metropolitan's actions were not discriminatory. This holding is consistent with our prior holding in *Barker v. Dayton Walther Corp.* (1989), 56 Ohio App.3d 1, 3, 564 N.E.2d 738, 740–741: "We

remain convinced that the statute [R.C. 4123.90] does not prevent an employer from discharging an employee who is unable to perform his duties; it merely prevents an employer from discharging an employee [in retaliation for his pursuing a right granted by statute]." We believe that the same principle applies in this case, where Lillback claims a right for belonging to a class protected by statute. We are also convinced that the case Lillback presents to us gives us no cause to abrogate Ohio's at-will employment doctrine merely because Lillback has suffered a back injury.

We conclude that the trial court did not err in granting summary judgment to Metropolitan on Lillback's Ohio civil rights claim.

■ Next, we will consider the merits of Lillback's claim that Metropolitan violated the Americans with Disabilities Act. Section 12112(a), Title 42, U.S.Code prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." We will assume, for purposes of this argument, that Lillback suffered from a "disability" as that is defined in Section 12102(2), and that it was a disability "known" to Metropolitan as required by Section 12112(b)(5)(A).

Section 12112(b)(5)(A) defines "discrimination" as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." A "reasonable accommodation" includes such things as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." Section 12111(9).

A "qualified individual with a disability" is "an individual with a disability who, *with or without reasonable accommodation,* can perform the essential functions of the employment position that such individual holds." (Emphasis added.) Section 12111(8).

Lillback was hired to sell insurance policies. He was required to meet with customers, interpret and explain Metropolitan's policies for them, and assist them in choosing the most appropriate policy for their needs. Lillback's lumbosacral sprain did not interfere with his ability to carry out these functions. Accordingly, he is a "qualified individual with a disability." Were this not the case, Metropoli-

tan could have fired him outright: he would not have been a member of the class Section 12112 was designed to protect.

Lillback's essential complaint is that Metropolitan did not accommodate his inability to perform a nonessential function—the carrying of the twenty-five pound computer on sales calls. He claims that as a result of this nonaccommodation, his sales production slipped, he lost a great deal of money he would otherwise have been able to earn in commissions, and was ultimately discharged. He suggested two ways in which Metropolitan might have accommodated his disability without unduly burdening the efficient operation of its business.

First, Lillback suggested that Metropolitan ought to have promoted him to a managerial position that he says was vacant when he returned to work in April 1992, and which would not have required him to carry any heavy equipment, or in fact to sell any insurance at all. Incidentally, this is the very promotion Lillback had been working for since he began his employment with Metropolitan in 1991. As Lillback testified, this promotion was generally granted based on an agent's success in selling insurance policies.

We hold that the Americans with Disabilities Act does not create a civil right to a promotion merely by virtue of a person's disability. To create such a "right" in persons with disabilities would be to compromise the civil rights of persons who are not disabled. The statute is rather designed to ensure that persons with and without disabilities have equal opportunities to perform the duties of their respective positions, and to freely compete for any benefits or promotions that good work may make available to them. Lillback has no right to this promotion merely because he suffered a lumbosacral sprain—he may, however, have a right to accommodation so that he may compete for it on the same footing as his non-disabled colleagues.

■ Lillback's second suggested accommodation was that Metropolitan might supply him with a person, perhaps an agent-in-training, to carry the computer for him on sales calls. It is not essential to Lillback's position that he carry a computer along with him when he visits client's houses to sell insurance policies: this is why he is "otherwise qualified" to be an agent. He described the computer as "a sales device in which info from the prospective client is inputted and the computer program sifts out what the client might need." Having the computer was a good way to keep his prospective clients interested in his sales presentation, and additionally allowed him to present the client with a quote on the spot. Lillback testified that the alternative to having a computer on sales calls was to collect information from a prospective client in his home and take this information back to the office for processing and calculating. His sales presentation would suffer without the prop, and the additional time required to present the client with a quote would give the person an opportunity to cool.

Whether Metropolitan should or should not have sent a lackey to carry Lillback's computer for him is not finally the issue in this case. The fundamental issue is whether Metropolitan was required to make an accommodation for Lillback's inability to carry the computer at all. Lillback presents a completely plausible argument that a computer is an enormously helpful sales tool, and that without it, his ability to sell insurance is appreciably compromised. He claims that the use of a computer was at least strongly recommended during his training. Apparently many of his former colleagues used computers in their sales presentations, and we agree that Lillback's disability should not present a barrier to his making use of something that is available and so useful to his nondisabled colleagues, if a reasonable accommodation can be made to remove the barrier.

However, we find that it was not Metropolitan's responsibility to make an accommodation that Lillback could easily have made himself. Lillback testified that he purchased his computer through Metropolitan when he began work there, and that it weighed, with its printer, twenty-five pounds. This court takes judicial notice that that is an inordinately heavy computer to be considered "portable." Even back in 1992, when Lillback labored under his disability, there were a good many laptop computers and portable printers on the market that weighed considerably less than twenty-five pounds. If Lillback needed a computer to effectively sell insurance, and his computer was too heavy for him to carry, the most sensible remedy was for him to sell the computer he had and purchase a lighter model that could run the same software. Alternatively, he might have procured a rolling "luggage rack" to move the computer. We do not interpret the ADA to require an employer to make accommodations for an employee with a disability when that employee is not helpless to accommodate himself.

Accordingly, Lillback's first through fourth and sixth assignments of error are overruled.

The judgment of the common pleas court is affirmed.

*Judgment affirmed.*

GRADY, P.J., and WOLFF, J., concur.