[Cite as *Bohan v. McDonald Hopkins, L.L.C.*, 2021-Ohio-4131.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

THOMAS BOHAN, ET AL.,                          :

     Plaintiffs-Appellants,          :

                                  No. 110060

     v.                                               :

MCDONALD HOPKINS, L.L.C., ET AL., :

     Defendants-Appellees.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 18, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-929479

---

### *Appearances:*

Robenalt Law Firm, Inc., Thomas D. Robenalt, and John
P. Colan, *for appellants*.

McCarthy, Lebit, Crystal & Liffman Co., L.P.A., David A.
Schaefer, and Nicholas R. Oleski, *for appellees*.

EILEEN T. GALLAGHER, J.:

{¶ 1} Plaintiffs-appellants, Thomas Bohan ("Bohan") and HB Alchemy, L.L.C. ("Alchemy")(collectively "plaintiffs"), appeal an order granting summary judgment in favor of defendants-appellees, Attorney Frank Wardega ("Wardega") and his law firm, McDonald Hopkins, L.L.C. ("McDonald Hopkins")(collectively

"defendants"), on their legal malpractice claims.  Plaintiffs claim the following errors:

> 1.  The trial court erred in its determination that plaintiffs-appellants failed to establish an attorney-client relationship with defendants-appellees.
>
> 2. The trial court erred in its determination that plaintiff-appellants failed to demonstrate that defendants-appellees breached any duties owed to plaintiffs-appellants.
>
> 3.  The trial court erred in its determination that plaintiffs-appellants failed to establish that any breach of the standard of care by defendants-appellees proximately caused plaintiffs-appellants' damages.
>
> 4.  The trial court erred when it failed to consider the derivative claims of HB Alchemy, L.L.C.
>
> 5.  The trial court erred when it granted summary judgment to defendants-appellees.

**{¶ 2}** After careful review of the record and applicable law, we affirm the trial court's judgment.

## I.  Facts and Procedural History

**{¶ 3}** Bohan is an experienced businessman, who has conducted business in China for several years.  As a result of his experience, Bohan acquired knowledge of international logistics and supply-chain management.  In late 2015 or early 2016, Jeffrey Rand ("Rand") told Bohan that he was having problems obtaining products for his company, HB Chemical, from suppliers in China.  Bohan indicated that he could solve Rand's problem, save his company money, and generate profits for a new company if he could establish a new purchasing platform in China.  Bohan and Rand

ultimately decided to set up a company for this purpose and called it HB Alchemy ("Alchemy").

{¶ 4} Rand introduced Bohan to Wardega, who was then a partner at the law firm of Kohrman, Jackson, & Krantz, L.L.P. Wardega had represented Rand and HB Chemical for approximately ten years, and Wardega drafted an operating agreement for Alchemy. When Bohan first met Wardega, Wardega disclosed to him that he had a longstanding relationship representing Rand and HB Chemical. (Wardega depo. at 79-80.)

{¶ 5} Bohan and Rand were established as co-managers of Alchemy when it was formed in 2016. Bohan and Rand each owned 44% of Alchemy's membership interests, and an employee of HB Chemical owned the remaining 12%. Bohan made suggestions during the process of drafting the operating agreement, and Wardega incorporated his suggestions into the final document. In an email dated March 21, 2016, from Wardega to Bohan, Wardega explained:

> Now that we have gone through all of the discussion on the operating agreement, I will have no problem whatsoever in representing HB Alchemy going forward. I am glad you asked the questions you did because now we have as much clarity as possible and my job will be very straightforward as to future matters — if I am representing the company on say an agreement with a vendor or customer it will be very straightforward — I am representing the interests of the company and trying to get the best deal for the company.

(Defendants' ex. C.)[1]

---

[1] The parties filed a joint supplementation of the record consisting of several exhibits. Plaintiffs' exhibits are identified by numbers, and defendants' exhibits are identified by letters.

{¶ 6} In 2017, Wardega left Kohrman, Jackson, & Krantz and joined McDonald Hopkins.  Rand, HB Chemical, and Alchemy followed Wardega to McDonald Hopkins.  After Wardega joined McDonald Hopkins, Bohan sent Wardega an email with instructions on what McDonald Hopkins needed to provide in order to be paid by Alchemy for legal services provided by Wardega.  Bohan's email states:

> Hi Frank,
>
> We need to set up a dedicated account for HB Alchemy at your fir [sic].  Also please be advised that electronic invoices are perfect, they do need to include detail on the invoices — time only is not acceptable.  Please email invoices to [email address].
>
> Please confirm when the account and bill to instructions are set up and if invoices will all come from [email address].  We have an automated handling process for invoices and need to confirm the origin email address to ensure proper routing of invoices.  We will process the attached invoice manually.
>
> Thank you
>
> Best Regards
>
> Tom

(Defendants' ex. D.)

{¶ 7} In October 2017, Wardega prepared a share redemption agreement that benefitted the majority members of Alchemy, namely Rand and Bohan.  (Wardega depo. at 150.)  Wardega continued to perform services for Alchemy sporadically until August 2018, when Wardega drafted a letter, at Bohan's request, to the internet provider GoDaddy, attesting to the fact that Alchemy was formed in Ohio and was

an active company. (Wardega depo. at 10.)[2] Wardega did not perform any more work for Alchemy after August 2018, except for a few emails regarding the potential sale of HB Chemical and Alchemy to Ravago Holdings America, Inc. ("Ravago"). (Wardega depo. at 10.)

{¶ 8} In March 2018, unbeknownst to Bohan, Rand engaged Western Reserve Partners L.L.C. ("WRP") to begin marketing the sale of HB Chemical to potential buyers. (Mayer depo. at 8.) Wardega was not involved in deciding to whom HB Chemical would be marketed or sold. (Mayer depo. at 10.) Kevin Mayer, an investment banker at WRP, who signed the engagement letter with HB Chemical and handled its marketing, testified at deposition that WRP

> agreed to market the business to a variety of interested parties, be they strategic parties, meaning other chemical distributors, or financial parties, meaning investment groups, private equity firms. We agreed that we would run an auction process, we prepared marketing materials, we contacted the buyers, we set up meetings with interested parties, and we created a market for the sale of the business.

(Mayer depo. at 9.)

{¶ 9} WRP prepared a Confidential Information Memorandum ("CIM"), a marketing document describing HB Chemical's business, to be shared with prospective buyers. (Mayer depo. at 11.) Wardega made edits and comments to the CIM. (Wardega depo. at 27.) At this point in time, Bohan still had no knowledge of the possible sale of HB Chemical. Notably, the CIM did not market the sale of Alchemy; it merely mentioned it as an affiliate of HB Chemical. (Mayer depo. at 13.)

---

[2] Wardega testified that he wrote the attestation letter in "early August." The attestation letter itself is dated July 27, 2018.

{¶ 10} In July 2018, Ravago expressed an interest in purchasing HB Chemical for between $75-80 million. (Mayer depo. at 81.) One month later, in August 2018, Rand informed Bohan that there were companies interested in purchasing HB Chemical, that they might be interested in also purchasing Alchemy, and that the potential buyers wanted to see Alchemy's financials. (Bohan depo. at 78.) Thereafter, Bohan, Rand, and Alchemy's chief financial officer, Mike Kostelec ("Kostelec"), met to review the financials. (Bohan depo. at 81.) Thereafter, Kostelec emailed Bohan the "summarized numbers of Alchemy," which were eventually disclosed to Ravago pursuant to a confidentiality agreement. (Bohan depo. at 84-85.) With respect to the confidentiality agreement, Wardega advised Bohan in an email dated August 23, 2018, that the definition of the term "Company" in the agreement was broad enough to cover and protect Alchemy's financial information. (Plaintiffs' ex. 8.)

{¶ 11} Bohan cooperated with the sales process, but he was concerned that Alchemy's value was not being adequately promoted. In an email to Rand and Wardega dated September 5, 2018, Bohan made "a point to highlight the ways in which Alchemy and its shareholders may be impacted by the sale of HB Chemical and how the inclusion of Alchemy in the sale may benefit the buyer, HB Chemical and Alchemy." (Defendants' ex. G; Plaintiffs' ex. 9.) Two days later, Ravago sent the first of two letters of interest to WRP expressing its interest in purchasing HB Chemical, Alchemy, and HB Mexico, another company affiliated with HB Chemical,

for a total of $92 million.  This first letter of interest, dated September 7, 2018, did not allocate values for each of the entities comprising the $92 million offer.

{¶ 12} On September 11, 2018, Wardega sent an email to Bohan advising that because he and Rand have co-management rights in Alchemy, "any sale or other transaction concerning Alchemy would have to be acceptable to both of you." (Defendants' ex. H.)  Wardega also advised Bohan that there was at least one bidder interested in purchasing Alchemy and that Bohan should engage separate counsel. (Defendants' ex. H; Bohan depo. at 97-98.)  Three days later, on September 14, 2018, Wardega received correspondence from Attorney Frances Goins of the law firm of Ulmer & Berne, advising him that the law firms of Ulmer & Berne and Cowden & Humphery were representing Bohan "in connection with his ownership interest and rights in HB Alchemy * * *."  (Defendants' ex. A.)

{¶ 13} Meanwhile, WRP and Ravago were endeavoring to allocate values for HB Chemical, HB Mexico, and Alchemy for purposes of determining the purchase prices of each company.  In an email to Mayer, Wardega suggested that "[p]erhaps research on market will support * * * a 2.5 multiple" could be used to value Alchemy, but concluded that we "[s]imply don't know at this point."  (Wardega depo. at 41-42.)  Wardega explained at deposition that he was merely suggesting a multiple, if the multiple were supported by research.  (Wardega depo. at 42.)  He also testified that valuation "is not the lawyer's role in a transaction of this nature."  (Wardega depo. at 44.)  Rather, "[a]ll of the maximizing, the value, the negotiations, the direct contact with the suitor or potential suitors is done through the investment banker.

I was not involved in it whatsoever." (Wardega depo. at 44.) Wardega explained that nobody knew what Alchemy was worth because it was a "captive supplier" with a "single customer." (Wardega depo. at 45.) Mayer similarly stated at deposition that finding a multiple for valuing a captive supplier is "very difficult to obtain, if not impossible." (Mayer depo. at 26-27.) In the end, all the valuations were handled by Ravago and the investment bankers. (Wardega depo. at 45; Sapp depo. at 11, 21.)

{¶ 14} Steve Sapp ("Sapp"), director of corporate finance for Ravago, was assigned the task of assigning a value to Alchemy. (Sapp depo. at 10.) While he was performing his valuations, he never spoke to Wardega or any other lawyer employed by McDonald Hopkins. (Sapp depo. at 11.) He averred that no one at McDonald Hopkins influenced the valuation he assigned to Alchemy. (Sapp depo. at 21.)

{¶ 15} Wardega later sent an email to Alchemy's co-managers, Bohan and Rand, with Ravago's estimated valuation. In the email, dated September 13, 2018, Wardega advised Bohan and Rand that the letter of intent was only binding on HB Chemical and Ravago because Alchemy was not a party to it. (Defendants' ex. K.) Thus, Alchemy had no rights or obligations under the letter of intent. The email further stated that "if you are willing to entertain a sale of HB Alchemy[,] then Ravago (or its counsel more likely) will directly reach out to your counsel." (Defendants' ex. K.) By that time, the law firms of Ulmer & Berne and Cowden & Humphery were representing Bohan "in connection with his ownership interest and rights in HB Alchemy * * *." (Defendants' ex. A; Bohan depo. at 119-120; Humphrey depo. at 8.) Attorney Robert Humphrey ("Humphrey") of Cowden & Humphrey

represented Bohan from at least September 14, 2018, until the sale of Alchemy closed five months later in February 2019. (Bohan depo. at 109, 116.)

**{¶ 16}** As previously stated, Ravago offered a total of $92 million for the purchase of HB Chemical, HB Mexico, and Alchemy. Of the total price, $80 million was allocated to HB Chemical, $5 million was allocated to HB Mexico, and $7 million was allocated to Alchemy. (Mayer depo. at 28.) Bohan ultimately agreed to the sale of Alchemy for $7 million. However, Bohan met with Mayer in a one-on-one meeting in November 2018 to express his concern that Alchemy was undervalued. (Bohan depo. at 141.) Yet, according to Mayer, no one ever asked WRP to do a valuation for Alchemy before the deal closed February 2019. (Mayer depo. at 90-91.) And Bohan admitted at deposition that he never submitted a proposal for what he believed Alchemy was worth. (Bohan depo. at 161-162.)

**{¶ 17}** Following the sale of Alchemy, Bohan, personally and on behalf of Alchemy filed a complaint against Wardega and McDonald Hopkins alleging legal malpractice. The complaint, which was amended twice, asserted claims for legal malpractice, breach of fiduciary duty, and punitive damages. Plaintiffs alleged the defendants caused Alchemy to be sold for less than it was worth.

**{¶ 18}** Following discovery, defendants filed a motion for summary judgment, arguing that plaintiffs' claims for breach of fiduciary duty and punitive damages, which were premised on the manner in which defendants represented plaintiffs, were subsumed within the legal malpractice claim. Defendants argued that plaintiffs' legal malpractice claim had to fail because there never was an

attorney-client relationship between defendants and Bohan, and the defendants' relationship with Alchemy terminated before the due diligence process for the sale of Alchemy began. Defendants maintained they did not represent Alchemy during the sales process and, therefore, could not be held liable for any undervaluation of it. The trial court agreed, found there was no attorney-client relationship between plaintiffs and defendants during the relevant time period, and granted the defendants' motion for summary judgment. Bohan now appeals the trial court's judgment.

## II. Law and Analysis

### A. Standard of Review

{¶ 19} Appellate review of summary judgments is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Pursuant to Civ.R. 56(C), summary judgment is appropriate when (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his or her favor. *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 653 N.E.2d 1196 (1995), paragraph three of the syllabus; *Zivich v. Mentor Soccer Club*, 82 Ohio St.3d 367, 696 N.E.2d 201 (1998).

{¶ 20} To prevail on a legal malpractice claim, the plaintiff must establish "(1) an attorney-client relationship, (2) professional duty arising from that relationship, (3) breach of that duty, (4) proximate cause, (5) and damages." *Shoemaker v.*

*Gindlesberger*, 118 Ohio St.3d 226, 2008-Ohio-2012, 887 N.E.2d 1167, ¶ 8, citing *Vahila v. Hall*, 77 Ohio St.3d 421, 427, 674 N.E.2d 1164 (1997); *Krahn v. Kinney*, 43 Ohio St.3d 103, 105, 538 N.E.2d 1058 (1989). Because the elements of a legal malpractice claim are stated in the conjunctive, the failure to establish any one element of the claim is fatal. *Estate of Hards v. Walton*, 8th Dist. Cuyahoga No. 93185, 2010-Ohio-3596, ¶ 7; *Williams-Roseman v. Owen*, 10th Dist. Franklin No. 99AP-871, 2000 Ohio App. LEXIS 4254 (Sept. 21, 2000).

## B. Attorney-Client Relationship

{¶ 21} In the first assignment of error, plaintiffs argue the trial court erred in concluding that plaintiffs did not have an attorney-client relationship with the defendants relative to the sale of Alchemy.

{¶ 22} A plaintiff cannot maintain a cause of action for malpractice against an attorney in the absence of an attorney-client relationship. *New Destiny Treatment Ctr., Inc. v. Wheeler*, 129 Ohio St.3d 39, 2011-Ohio-2266, 950 N.E.2d 157, ¶ 32. Therefore, the first step of our analysis requires us to determine whether there was an attorney-client relationship between each of the plaintiffs and defendants.

{¶ 23} An attorney-client relationship can be created by either the express or implied conduct of the parties. *Id.* at ¶ 26. Where the parties have an express agreement of representation, the attorney-client relationship is easily identified. It is more complicated when the relationship is established by implication. In those cases, the test for determining the existence of an attorney-client relationship

involves both a subjective and objective test. *Stuffleben v. Cowden*, 8th Dist. Cuyahoga No. 82537, 2003-Ohio-6334, ¶ 22. A court must consider (1) whether the putative client believed there was an attorney-client relationship, and (2) whether the putative client's belief was reasonable "based on the surrounding circumstances." *Id.* at ¶ 21-22, citing *Lillback v. Metro. Life Ins. Co.*, 94 Ohio App.3d 100, 109, 640 N.E.2d 250 (2d Dist. 1994.). The client's belief, by itself, it not sufficient to establish an attorney-client relationship. *Id.* at ¶ 23 (trial court erred in finding the existence of an attorney-client relationship based solely on the client's belief without considering whether the belief was reasonable.).

{¶ 24} In determining whether a client's belief was reasonable under the circumstances, the Sixth Circuit Court of Appeals, applying Ohio law, has held that several factors should be considered, including

> whether (1) the client shared confidential information with the attorney, (2) the attorney offered legal advice or services, (3) the client relied on the advice, (4) the client sought to form an attorney-client relationship, (5) the attorney appeared on behalf of the client in judicial or administrative proceedings, and (6) the attorney prepared legal instruments.

*Hustler Cincinnati, Inc. v. Cambria*, 625 Fed. Appx. 712, 716 (Aug.14, 2015), citing *Sayyah v. Cutrell*, 143 Ohio App.3d 102, 757 N.E.2d 779 (12th Dist.2001); *Landis v. Hunt*, 80 Ohio App.3d 662, 610 N.E.2d 554 (10th Dist.1992); *David v. Schwarzwald, Robiner, Wolf & Rock Co.*, 79 Ohio App.3d 786, 607 N.E.2d 1173 (8th Dist.1992).

{¶ 25} The attorney-client relationship with respect to each plaintiff must be analyzed separately because while there is evidence of an express attorney-client relationship between the defendants and Alchemy, there is no evidence of an express attorney-client relationship between the defendants and Bohan. Bohan never executed a written fee-agreement with defendants in a personal capacity. Indeed, Bohan alleged that the defendants never "ask[ed] that an engagement letter be executed for the service they provided." (Second amended complaint ¶ 14.) "'[A] statement of fact by a party in his pleading is an admission that the fact exists as stated, and, as such, is admissible against him in favor of his adversary.'" *Haney v. Law*, 1st Dist. Hamilton No. C-070313, 2008-Ohio-1843, ¶ 8, quoting *Teagle v. Lint*, 9th Dist. Summit No. 18425, 1998 Ohio App. LEXIS 1560 (Apr. 15, 1998). Thus, by admission, there never was an express contractual agreement between Bohan and the defendants.

{¶ 26} Nor does the evidence support a finding that an attorney-client relationship arose between Bohan and the defendants by implication. Although there is evidence that defendants represented Alchemy, "Ohio law has consistently held that 'an attorney's representation of a corporation does not make that attorney counsel to the corporate officers and directors as individuals.'" *Maloof v. Benesch, Friedlander, Coplan & Aronoff*, 8th Dist. Cuyahoga No. 84006, 2004-Ohio-6285, ¶ 17, quoting *Nilavar v. Mercy Health Sys. W. Ohio*, 143 F.Supp.2d 909, 913 (S.D.Ohio 2001). *See also Fornshell v. Roetzel & Andress, L.P.A.*, 8th Dist. Cuyahoga Nos. 92132 and 92161, 2009-Ohio-2728 (applying the same rule to

members of limited liability companies.); Prof.Cond.R. 1.13(a) ("a lawyer employed or retained by an organization owes allegiance to the organization and not to any constituent or other person connected with the organization."). Thus, Wardega's communications with Bohan concerning Alchemy do not establish an attorney-client relationship between the defendants and Bohan, individually.

{¶ 27} Bohan also never shared any personal, confidential information with Wardega. As previously stated, Rand introduced Bohan to Wardega, who drafted the operating agreement for Alchemy. Thereafter, the majority of the communication between Bohan and Wardega, whether on the phone, in person, or by email, included Rand, the co-manager of Alchemy. (Bohan depo. at 66-67.) Bohan nevertheless argues that Wardega's August 23, 2018 email to him regarding the scope of the confidentiality agreement proves there was an attorney-client relationship between him and the defendants. However, Rand was included in the email, and Wardega's advice regarding the confidentiality agreement applied to Alchemy, not Bohan. All of the communications cited by Bohan in support of an attorney-client relationship related to Alchemy, and there is no evidence of any confidential communication between Wardega and Bohan relating to Bohan personally.

{¶ 28} Finally, all of Wardega's bills were submitted to Alchemy for payment, not Bohan. After the operating agreement for Alchemy was signed, Wardega sent an email to Bohan and Rand, stating that he, Wardega, "will have no problem whatsoever in representing HB Alchemy going forward." (Defendants' ex. C.) After

Wardega joined McDonald Hopkins, Bohan sent him an email with instructions on what he needed to provide in order to be paid by Alchemy. The email expressly states, in relevant part: "We need to set up a dedicated account *for HB Alchemy* at your fir[m]." (Defendants' ex. D, emphasis added.) There is no evidence that Wardega ever billed Bohan, individually, for any services rendered on his behalf, nor is there any evidence that Bohan requested a billing account be set up for him personally. In *Hustler Cincinnati*, the court held that the absence of invoices between a purported client and an attorney tended to show the absence of an attorney-client relationship. *Hustler Cincinnati*, 625 F.Appx. at 717. *See also McGuire v. Draper, Hollengaugh & Briscoe Co., L.P.A.*, 4th Dist. Highland No. 01CA21, 2002-Ohio-6170, ¶ 53 (same). Therefore, the undisputed evidence demonstrates that Bohan, individually, never had an attorney-client relationship with the defendants, and the trial court properly granted summary judgment on Bohan's personal claims against the defendants.

{¶ 29} The relationship between Alchemy and the defendants is more complicated. Wardega drafted the operating agreement for Alchemy, drafted a share redemption agreement that increased Bohan's individual ownership in Alchemy, and sent an attestation letter to GoDaddy, verifying that Alchemy was formed in Ohio and was an active company. In the attestation letter, dated July 27, 2018, Wardega represented that he and McDonald Hopkins were "counsel for the company." (Plaintiff's ex. 18.) And, as previously stated, Wardega sent legal bills to Alchemy for payment. There is no question that the defendants represented

Alchemy. Defendants contend, however, that the attorney-client relationship between them and Alchemy terminated before the sales process with respect to Alchemy began, that defendants were not involved in the valuation or marketing of Alchemy and that, therefore, they cannot be liable for any undervaluation of Alchemy.

{¶ 30} Defendants never sent a letter stating that they no longer represented Alchemy. Nevertheless, an attorney-client relationship does not continue indefinitely simply because it was not terminated in writing. "[U]nder Ohio law, as under the law of most States, the attorney-client relationship ends when the lawyer completes the task for which he was hired[.]" *Hustler Cincinnati*, 625 Fed.Appx. at 15, citing *Kouba v. Climaco*, 8th Dist. Cuyahoga No. 38585, 1979 Ohio App. LEXIS 9643 (Mar. 15, 1979).

{¶ 31} Wardega was retained to draft Alchemy's operating agreement and performed tasks for the company on an ad hoc basis. Plaintiffs contend Wardega committed malpractice with respect to the sale of Alchemy because he continued to represent Alchemy during the negotiations. In support of that argument, plaintiffs cite to the fact that Wardega edited a CIM in the summer of 2018, which eventually led to the sale of Alchemy. However, the undisputed evidence shows that the CIM did not market the sale of Alchemy; it marketed the sale of HB Chemical. (Defendants' ex. E.) Indeed, Alchemy was only mentioned once in the 34-page document and was identified as an affiliated entity of HB Chemical. When asked at

deposition whether Alchemy was intended to be sold together with HB Chemical, Mayer explained:

> It was not contemplated that all of this was going to be sold together. And in the marketing materials, we had outlined what was to be included in the transaction and then what the other related entities were, and really left it to the buyer to decided what the potential interest was in those entities.
>
> \* \* \*
>
> This slide [page 16 of the CIM] attempted to delineate the different entities related to HB Chemical. And, specifically, we put a box around, on the left-hand side, HB Chemical Corporation and Polymer Southeast and said "included in the transaction." \* \* \*

(Mayer depo. at 48-49.) Because Alchemy was not "included in the transaction," there was no sales information related to Alchemy in the CIM. (Mayer depo. at 13.) Thus, even though Wardega edited the CIM, those edits had nothing to do with Alchemy. And although Wardega participated in the sales process of HB Chemical, which later resulted in the sale of Alchemy, there is no evidence that he represented Alchemy once Ravago became interested in buying Alchemy in the middle of September 2018.

{¶ 32} In July 2018, Ravago expressed an interest in buying HB Chemical for $75 to $80 million. (Mayer depo. at 81.) No one communicated this offer to Bohan because he was not an owner of HB Chemical and, therefore, was not entitled to that information. (Mayer depo. at 82.) However, after additional marketing, Ravago became interested in possibly purchasing the entities affiliated with HB Chemical, including Alchemy. (Mayer depo. at 81.)

{¶ 33} On August 23, 2018, Ravago requested Alchemy's financial records in order to explore whether it was worth purchasing along with HB Chemical. (Wardega depo. at 133-134.) Bohan was aware of the potential interest and fully cooperated in providing the financials. He met with Rand and Kostelec to review the financials and agreed to disclose them to Ravago pursuant to a confidentiality agreement. (Bohan depo. at 83-85.) Thereafter, on September 7, 2018, Ravago sent the first of two letters of intent expressing its desire to purchase HB Chemical, HB Mexico, and Alchemy for a total of $92 million. The first letter of intent did not allocate separate values for each of the three entities: HB Chemical, HB Mexico, and Alchemy.

{¶ 34} Wardega testified at deposition that once the first letter of intent was received on September 7, 2018, it became clear that Bohan's interests and Rand's interests "would not necessarily be the same interests" and that there was a "potential conflict of interests." (Wardega depo. at 78.) Consequently, Wardega sent Bohan an email on September 11, 2018, instructing him to "engage separate counsel." (Plaintiffs' ex. 12; Wardega depo. at 79.) Thereafter, Wardega held himself out to Ravago and others as Rand's counsel as to Alchemy. (Wardega depo. at 180.)

{¶ 35} In the meantime, Bohan had already contacted Humphrey to engage his representation on August 23, 2018, and Bohan discussed the matter with Humphrey in early September. (Bohan depo. at 100.) As previously stated, Wardega was notified on September 14, 2018, that the law firms of Ulmer & Berne and Cowden & Humphrey were representing Bohan "in connection with his

ownership interest and rights in HB Alchemy." (Defendants' ex. A; Bohan depo. at 134.) Wardega testified at deposition that after he advised Bohan to engage separate counsel on September 11, 2018, Alchemy, itself, was no longer represented by counsel. Thereafter, Wardega represented Rand's interests in Alchemy, and the law firms of Ulmer & Berne and Cowden & Humphrey represented Bohan's interests in Alchemy. (Wardega depo. at 13, 121, 182.) The fact that defendants no longer represented Alchemy as of September 11, 2018, and that Bohan and Rand's interests in Alchemy were represented by separate counsel is well documented in the record.

{¶ 36} Plaintiffs nevertheless assert that Wardega continued to provide legal advice to Bohan when Wardega forwarded the second letter of intent to Bohan in an email dated September 13, 2018. However, the email indicates that Wardega sent it to Bohan at Rand's request. (Plaintiffs' ex. 15; Wardega depo. at 146.) The first paragraph of the email begins: "Jeff asked me to forward the attached exhibit to you." (Plaintiffs' ex. 15.) Twice in the email, Wardega states that he was providing the information to Bohan, not as his attorney nor as Alchemy's attorney, but "as a courtesy." (Plaintiffs' ex. 15.) Moreover, the email concludes by stating: "Please advise once you have selected counsel." (Plaintiffs' ex. 15; Wardega depo. at 146.)

{¶ 37} The second letter of intent, dated September 14, 2018, had exhibits relating to each of the entities included in the offer. As relevant here, "Exhibit B" expresses Ravago's interest in purchasing Alchemy and states that "[t]he draft

definitive agreement for [Alchemy]³ would be simultaneously submitted by Buyer's counsel to Jeff Rand's and Tom Bohan's respective designated counsels." (Plaintiffs' ex. 16.) Thus, by September 14, 2018, it was clear to third parties such as Ravago that Alchemy's interests were separately represented by counsel for Bohan and counsel for Rand. Exhibit B makes no mention of counsel for Alchemy itself.

{¶ 38} Wardega testified that Bohan and Rand signed an engagement letter with WRP to market and sell Alchemy in October 2018. The engagement letter allowed WRP to market and sell Alchemy and thus officially initiated the sales process with respect to Alchemy. More importantly, Bohan and Rand signed the engagement letter after Wardega had already stopped representing Alchemy. (Wardega depo. at 23-24.) Plaintiffs have not presented any evidence to refute this evidence.

{¶ 39} In an email dated October 3, 2018, Wardega advised Humphrey that he and Rand were "open" to the idea of hiring an independent third party to do an evaluation appraisal of Alchemy if Bohan believed the $7 million offer was inadequate. (Bohan depo. at 165, 170.) Wardega further stated at deposition that Bohan had "the opportunity to interface directly with Ravago and counsel. And they went on and willingly signed authorizing resolutions, purchase agreement, et cetera, and closed the deal * * * ." (Wardega depo. at 110.)

---

³ Exhibit B of the September 14, 2018 letter of intent refers to Alchemy as HB China. Wardega explained that the term "HB China" is "the definitional term they use for HB Alchemy." (Wardega depo. at 53-54.)

{¶ 40} Although the second letter of intent offered "up to $7 million" for Alchemy, Mayer explained that deals sometimes close for different values than those proposed in the letter of intent. (Mayer depo. at 33.) The final price is generally determined after completing a period of due diligence. (Mayer depo. at 33-35.) Mayer spoke with Humphrey at least a few times during Alchemy's due diligence period. (Mayer depo. at 36.) An email from Sapp to Mayer on January 18, 2019, indicates that Ravago was still reviewing Alchemy's financials and was "still processing any other potential change to that purchase price for HB Alchemy." (Mayer depo. at 40) Yet, there is no evidence that a third-party valuation was ever conducted before the sale closed in late February 2019, even though Ravago was still assessing its value in January 2019. (Bohan depo. at 165.)

{¶ 41} Ravago ultimately purchased Alchemy for $7 million when the deal closed on February 28, 2019, more than four months after Wardega stopped representing Alchemy and Bohan's interests in Alchemy were represented by attorneys at Ulmer & Berne and Cowden & Humphrey. The record is clear that Wardega did not represent Bohan or Alchemy with respect to the sale of Alchemy, the process of which began in mid-September 2018. Bohan was represented by separate counsel during the sales process and ultimately agreed to the sale of Alchemy "of [his] own freewill." (Bohan depo. at 179.)

{¶ 42} Indeed, Bohan admitted that he retained Humphrey to represent him in the sale of Alchemy. (Bohan depo. at 116, 118.) Moreover, Wardega never billed Alchemy for any work relating to the sale of Alchemy. (Wardega depo. at 15, 102.)

Thus, because defendants did not have an attorney-client relationship during the marketing and sale of Alchemy, they cannot be liable for legal malpractice with respect to that transaction. *New Destiny*, 129 Ohio St.3d 39, 2011-Ohio-2266, 950 N.E.2d 157, at ¶ 32 (A plaintiff cannot maintain a cause of action for legal malpractice in the absence of an attorney-client relationship.).

{¶ 43} The first assignment of error is overruled.

{¶ 44} Having determined that plaintiffs never had an attorney-client relationship with Bohan individually and that the attorney-client relationship between Alchemy and defendants terminated before the marketing and sale of Alchemy, the remaining assigned errors, which are contingent on the existence of an attorney-client relationship during that transaction, are moot.

{¶ 45} Judgment affirmed.

It is ordered that appellees recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR